## No. 24-11310

## IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

Benjamin **WATSON**, Jr., et al.,

*Plaintiffs-Appellants*,

*v.*

**KINGDOM OF SAUDI ARABIA**,

*Defendant-Appellee.*

_____

On Appeal from the U.S. District Court
for the Northern District of Florida (Pensacola)
The Honorable M. Casey Rodgers
(No. 3:21-cv-329-MCR-ZCB)

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

**Christopher G. Paulos**
Levin, Papantonio, Proctor, Buchanan,
 O'Brien, Barr & Mougey, P.A.
316 South Baylen St., Ste. 600
Pensacola, FL  32502

**Jeffrey E. McFadden**
Law Offices of Jeffrey E. McFadden, LLC
312 Prospect Bay Drive East
Grasonville, MD  21638

**Stephen I. Vladeck**
 *Counsel of Record*
600 New Jersey Ave., N.W.
Washington, DC  20001
(202) 662-9313
svladeck@gmail.com

**Matthew S. Mokwa**
The Maher Law Firm, P.A.
398 W. Morse Blvd., Ste. 200
Winter Park, FL  32789

*Counsel for Plaintiffs-Appellants*

July 25, 2024

<u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fed. Rule App. P. 26.1 and 11th Cir. R. 26.1-1, the following are the persons plaintiffs-appellants believe have an interest in this appeal:

1.  Blackwell, Carly
2.  Blackwell, Ryan
3.  Bolitho, Honorable Zachary C.
4.  Bortner, Thomas C.
5.  Brady, Evelyn
6.  Brady, John Robert
7.  Brodsky Fotiu-Wojtowicz PLLC
8.  Brodsky, Benjamin H.
9.  Cash, III, William F.
10. DC Legal Advisory Group, PLLC
11. Elliott Law Firm PA
12. Elliott, Kris
13. Glass, Jonathan
14. Glass, Joy
15. Haitham, Sameth
16. Haitham, Shadin
17. Harris, David E.
18. Hogue, Charles
19. Housam, Matthew
20. Hoyland, Michael
21. Johnson, George
22. Keebler, Krystena
23. Keebler, Matthew
24. Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
25. Kellogg, Michael K.
26. Kingdom of Saudi Arabia
27. Kreindler & Kreindler LLP
28. Kreindler, James P.
29. Lawrence, Jr., Irvin
30. Lehmer, Kristy

### CERTIFICATE OF INTERESTED PERSONS (CONTINUED)

31. Levin, Papantonio, Proctor, Buchanan, O'Brien, Barr & Mougey, P.A.
32. LNW a minor child
33. Lopez, Grant
34. Lopez, Heather
35. Maher, Michael C.
36. Maloney, III, Andrew J.
37. McFadden, Jeffrey E.
38. Melton, II, R. Frank
39. Mokwa, Matthew S.
40. Newsome Melton, P.A.
41. Paulos, Christopher G.
42. Pickett, Curtis
43. Pickett, Jessica
44. Rapawy, Gregory G.
45. Rodgers, Honorable M. Casey
46. Rose, Daniel O.
47. Shen, Andrew C.
48. Sico Hoelscher Harris LLP
49. SLW a minor child
50. SSH a minor child
51. SSH II a minor child
52. Stern, Jesse
53. The Law Offices of Jeffrey E. McFadden, LLC
54. The Maher Law Firm, P.A.
55. Thomas, Breanna
56. Tinch, Jessica
57. Tinch, Matthew
58. Vladeck, Stephen I.
59. Walters, Dustin
60. Walters, Mason
61. Walters, Shane
62. Walters, Walters
63. Watson, Jr., Benjamin
64. Watson, Sheila Wilemon

iii

## CORPORATE DISCLOSURE STATEMENT

No party to this appeal is a corporation.

iv

## <u>STATEMENT RESPECTING ORAL ARGUMENT</u>

In addition to raising important questions about a foreign sovereign's civil liability for an act of international terrorism on U.S. soil, this appeal raises a number of questions of first impression in this Court regarding the Foreign Sovereign Immunities Act—including the meaning of certain provisions of the Justice Against Sponsors of Terrorism Act of 2016, which neither this Court nor any other court of appeals has previously interpreted. For those reasons, appellants respectfully request oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................i

CORPORATE DISCLOSURE STATEMENT ..................................................... iii

STATEMENT RESPECTING ORAL ARGUMENT ............................................iv

TABLE OF AUTHORITIES..........................................................................vii

STATEMENT OF JURISDICTION .................................................................1

STATEMENT OF THE ISSUES ......................................................................1

INTRODUCTION ........................................................................................1

STATEMENT OF THE CASE .........................................................................6

   1.   The Security Cooperation Education & Training Program ...........6

   2.   Al-Shamrani and the December 6 Attack......................................9

   3.   The Investigations into the December 6 Attack...........................14

   4.   This Lawsuit.................................................................................17

   5.   Chart of Appellants' Claims / Applicable FSIA Exceptions ..........21

SUMMARY OF ARGUMENT ......................................................................22

ARGUMENT.............................................................................................24

  I.   THE DISTRICT COURT ERRED IN HOLDING THAT
      NONE OF APPELLANTS' CLAIMS FALL WITHIN
      THE FSIA'S NON-COMMERCIAL TORT EXCEPTION ...........................27

      A.   The District Court Wrongly Held that the Kingdom
          Had Discretion to Shirk Its Mandatory Duties....................29

      B.   Most of the Kingdom's Breaches (and Those of Its
          Officials and Agents) "Occurr[ed] in the United States"......34

  II.   THE DISTRICT COURT ERRED IN CONCLUDING THAT
      NONE OF APPELLANTS' CLAIMS FALL WITHIN
      JASTA'S EXCEPTION TO FOREIGN SOVEREIGN IMMUNITY ...............38

      A.   Appellants Have Plausibly Alleged Numerous
          Scope-of-Employment Torts................................................43

      B.   The District Court Erred in Holding that Appellants'
          JASTA Claims Relate Only to Acts of Omission .................48

<u>TABLE OF CONTENTS (CONTINUED)</u>

C.   The District Court Wrongly Dismissed Appellants'
     Allegations of the Kingdom's Material Support to
     AQAP as "Conclusory" ........................................................50

III. THE DISTRICT COURT ERRED IN DENYING JURISDICTIONAL
     DISCOVERY .........................................................................58

CONCLUSION ..................................................................................63

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................................65

## TABLE OF AUTHORITIES*

### Cases

*Am. Dental Ass'n* v. *Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010)...........................................................55

*Arch Trading Corp.* v. *Republic of Ecuador*,
  839 F.3d 193 (2d Cir. 2016) ..............................................................59

*Berkovitz* v. *United States*,
  486 U.S. 531 (1988).................................................................... 32, 33

*Broidy Capital Mgmt., LLC* v. *State of Qatar*,
  982 F.3d 582 (9th Cir. 2020)....................................................... 25, 36

*Butler* v. *Sukhoi Co.*,
  579 F.3d 1307 (11th Cir. 2009)............................................. 25, 59, 61

*Carlyle* v. *U.S. Dep't of the Army*,
  674 F.2d 554 (6th Cir. 1982)..............................................................31

*Glickman* v. *United States*,
  626 F. Supp. 171 (S.D.N.Y. 1985)......................................................34

*Global Marine Exploration, Inc.* v. *Republic of France*,
  33 F.4th 1312 (11th Cir. 2022) ..........................................................25

*Hennagan* v. *Dep't of Highway Safety & Motor Vehicles*,
  467 So.2d 748 (Fla. 1st DCA 1985) ...................................................43

*Holder* v. *Humanitarian Law Proj.*,
  561 U.S. 1 (2010) ..............................................................................52

*Iglesia Cristiana La Casa del Señor, Inc.* v. *L.M.*,
  783 So.2d 353 (Fla. 3d DCA 2001) ...................................................43

*In re Terrorist Attacks on Sept. 11, 2001*,
  740 F. Supp. 2d 494 (S.D.N.Y. 2010)................................................49
  134 F. Supp. 3d 774 (S.D.N.Y. 2015)................................................39
  No. 15-3426, 2017 WL 8776686 (2d Cir. Feb. 7, 2017) (mem.)...........39
  298 F. Supp. 3d 631 (S.D.N.Y. 2018)........................................... 44, 56
  No. 1:03-md-1570, 2023 WL 5132138 (S.D.N.Y. Aug. 10, 2023) .........49

*Iqbal* v. *Ashcroft*,
  556 U.S. 662 (2009)...........................................................................54

*Joseph* v. *Office of Consulate General of Nigeria*,
  830 F.2d 1018 (9th Cir. 1987)............................................................36

---

* Per 11th Cir. R. 28-1(e), sources on which appellants primarily rely are marked with an asterisk.

viii

## TABLE OF AUTHORITIES (CONTINUED)

*Keating* v. *City of Miami*,
   598 F.3d 753 (11th Cir. 2010)...........................................................57

*Mamani* v. *Berzain*,
   654 F.3d 1148 (11th Cir. 2011)..........................................................55

*Mwani* v. *bin Laden*,
   415 F.3d 1 (D.C. Cir. 2005)................................................................25

*O'Bryan* v. *Holy See*,
   556 F.3d 361 (6th Cir. 2009)......................................................29, 35

*Ochran* v. *United States*,
   117 F.3d 495 (11th Cir. 1997)...........................................................30

*Olsen ex rel. Sheldon* v. *Gov't of Mexico*,
   729 F.2d 641 (9th Cir. 1984)............................................................36

*Owens* v. *Republic of Sudan*,
   864 F.3d 751 (D.C. Cir. 2017)...........................................................56

*Quality Auto Painting Ctr. of Roselle, Inc.* v.
   *State Farm Indemnity Co.*,
   917 F.3d 1249 (11th Cir. 2019) (en banc)...........................................7

*Rasul* v. *Myers*,
   512 F.3d 644 (D.C. Cir. 2008)..........................................................43

*Rodriguez* v. *Pan Am. Health Org.*,
   29 F.4th 706 (D.C. Cir. 2022) ..........................................................25

*Spencer* v. *Assurance Co. of America*,
   39 F.3d 1146 (11th Cir. 1994)..........................................................45

*St. George* v. *Pinellas County*,
   285 F.3d 1334 (11th Cir. 2002)........................................................56

*Swafford* v. *United States*,
   839 F.3d 1365 (11th Cir. 2016).........................................................30

*Twitter, Inc.* v. *Taamneh*,
   598 U.S. 471 (2023)..........................................................................49

## Statutes and Rules

18 U.S.C.
   § 2333.............................................................................................40
   § 2333 note....................................................................................40
   § 2333(d).........................................................................................48
   § 2339.............................................................................................48

ix

## TABLE OF AUTHORITIES (CONTINUED)

18 U.S.C.

§ 2339A ............................................................... 48, 50, 52
§ 2339B ........................................................ 46, 48, 51, 52
§ 2339B(d)(2) .............................................................. 52
§ 2339C .................................................................... 48
§ 2339D .................................................................... 40

28 U.S.C.

§ 517 ....................................................................... 18
§ 1330(a) .................................................................. 25
§ 1605(a) .................................................................... 1
§ 1605(a)(1) ................................................................. 3
§ 1605(a)(2) ................................................................. 4
*§ 1605(a)(5) ............................................................. 3, 27
§ 1605(a)(5)(A) ............................................................ 27
§ 1605(a)(5)(B) ............................................................ 27
§ 1605(b) .................................................................. 52
*§ 1605B .................................... 1, 4, 44, 45, 48, 49, 52, 56
*§ 1605B(b) ............................................... 43, 44, 45, 52
§ 1605B(d) ........................................................ 48, 49, 56
§ 2680(a) .................................................................. 29

Justice Against Sponsors of Terrorism Act of 2016,
Pub. L. No. 114-222, 130 Stat. 852 ...................................... 40

Fed. R. Civ. P. 12(b)(1) ..................................................... 1

## Other Authorities

Robert Chesney,
The Sleeper Scenario: Terrorism-Support Laws and
the Demands of Prevention,
42 HARV. J. ON LEGIS. 1 (2005) ........................................... 53

W. PAGE KEETON, DAN B. DOBBS, ROBERT E. KEETON, & DAVID G. OWEN,
PROSSER AND KEETON ON TORTS (5th ed. 1984) ................................ 49

WAYNE LAFAVE,
SUBSTANTIVE CRIMINAL LAW (3d ed. 2018) ................................... 49

* * *

## STATEMENT OF JURISDICTION

The district court granted defendant-appellee's motion to dismiss under Fed. R. Civ. P. 12(b)(1) on March 30, 2024, *see* App. 251a, and entered a final judgment on March 31, 2024. *Id*. at 294a. This timely appeal followed. *See id*. at 11a. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Did the district court err in concluding that plaintiffs' First Amended Complaint failed to allege an exception to foreign sovereign immunity under 28 U.S.C. § 1605(a) or 1605B?

2.  Did the district court err in denying plaintiffs' request for jurisdictional discovery?

## INTRODUCTION

On December 6, 2019, Mohammed Saeed Al-Shamrani, a Second Lieutenant in the Royal Saudi Air Force (RSAF), murdered three U.S. servicemembers and severely injured four U.S. Navy servicemembers; a Navy civil servant; seven Escambia County Sheriff's deputies; and a member of the Department of Defense Police Force in a shooting at Naval Air Station (NAS) Pensacola. It is undisputed that Al-Shamrani carried out the attack on behalf of al Qaeda in the Arabian Peninsula (AQAP) and timed it to coincide with the second anniversary of then-

President Trump's recognition of Jerusalem as the capital of Israel. Given the content of Al-Shamrani's online and private messages leading up to the attack, the FBI concluded that the shooting was an act of international terrorism motivated by jihadist ideology.

Al-Shamrani, who was wearing his Saudi Air Force uniform (and, indeed, was **on duty**) at the time of the shooting, was in the United States—and had access to NAS Pensacola—only as part of an officer training program for which the Saudi government had specifically contracted with the United States. More than just a passive sponsor of Al-Shamrani's involvement in the training program, plaintiffs-appellants plausibly alleged that Saudi Arabia was, and should have been, aware of Al-Shamrani's radicalization well in advance of the attack—if not his plans for the attack itself. And yet, not only did the Saudi government do nothing to prevent it; it took numerous affirmative steps to **facilitate** it, including by securing Al-Shamrani's participation in the training program in the first place. And when the Saudi officer charged with supervising Al-Shamrani and other Saudi officers while they were in the training program—the Country Liaison Officer (CLO)—left his post without explanation (to return to Saudi

Arabia) in September 2019, the Saudi government declined to provide a replacement until after Al-Shamrani's attack three months later.

Appellants are the 16 victims of Al-Shamrani's attack, their family members, and the representatives of their estates. They brought this suit against defendant-appellee the Kingdom of Saudi Arabia, alleging that the Kingdom was and should be liable for its wrongful acts and those of its agents and officers, including while the latter were on duty in their official capacities overseas. The complaint pleads 19 causes of action reflecting three distinct temporal sources of the Kingdom's liability: (1) when the Kingdom (and its officers and agents) chose Al-Shamrani to participate in the training program in the first place; (2) when the Kingdom (and its officers and agents) facilitated his continuing participation in the program thereafter; and (3) the attack itself.

When the Kingdom moved to dismiss appellants' claims under the Foreign Sovereign Immunities Act of 1976 (FSIA), appellants invoked four exceptions to the immunity conferred by that statute, three of which are at issue here: the exception for waiver, 28 U.S.C. § 1605(a)(1); the exception for "non-commercial torts," *id*. § 1605(a)(5); and the

exception added by Congress in 2016 in the Justice Against Sponsors of Terrorism Act (JASTA) for certain acts of international terrorism committed on U.S. soil. *See id.* § 1605B.[1]

Adopting the magistrate judge's report and recommendation, the district court denied appellants' request for jurisdictional discovery and granted the Kingdom's motion to dismiss. In the process, the district court made a hash out of the nuanced questions raised by the Kingdom's motion—analyzing only some of appellants' causes of action; considering how the relevant FSIA exceptions apply to only some of the pleaded theories of liability; and not addressing at all why some of the counts (*e.g.*, appellants' Florida hate crimes and breach-of-contract claims) had to be dismissed.

And the analysis that the district court **did** conduct was riddled with errors—interpreting the FSIA's exceptions to require far more than they do; misreading JASTA to make it effectively impossible to satisfy; discounting plausible factual allegations that Saudi Arabia had not disputed; collapsing the analysis of the distinct tort claims

---

1. In the district court, appellants also argued that some of their claims fall within the FSIA's "commercial activity" exception. *See* 28 U.S.C. § 1605(a)(2). Appellants do not press that argument here.

appellants have alleged; and dismissing as "conclusory" and "speculative" claims that are neither, but that the district court simply deemed insufficient to prove appellants' claims on the merits only (and wrongly) in light of the Kingdom's factual denials.

These errors did not just deprive appellants of any opportunity to develop their substantial claims against the Kingdom; they deprived the district court of the evidence it needed to properly resolve the Kingdom's motion to dismiss. If left uncorrected, the district court's missteps would provide all foreign governments with far broader immunity for the tortious conduct of their officers while on official assignment on U.S. soil than Congress ever intended. Indeed, the district court's unjustified narrowing of JASTA's new exception to foreign sovereign immunity for acts of international terrorism on U.S. soil—an amendment intended to encompass cases just like this one (and against Saudi Arabia, in particular)—would render that provision a nullity.

Simply put, dismissal of the entire suit at this premature stage was unwarranted on the pleadings alone and unsupported by the analysis that the district court provided—and would set an ominous

precedent for future efforts to hold foreign sovereigns accountable in U.S. courts for the wrongful official, and even terroristic, acts of their officers and agents while on duty on U.S. soil. The decision below should be reversed, and the case should be returned to the district court for further proceedings.

STATEMENT OF THE CASE

1.  **The Security Cooperation Education & Training Program**

Saudi Arabia is the United States' largest foreign military sales customer, with more than $350 billion in active military contracts pending. A significant portion of the arms trade between Saudi Arabia and the United States involves the training of Saudi Arabian airmen, soldiers, and sailors on U.S. military bases. The United States' training of Saudi airmen, soldiers, and sailors is funded by the Kingdom and is a critical component and condition of Saudi Arabia's purchase of U.S. aircraft, vessels, military equipment, and weapons systems. Indeed, at the end of 2019, there were 852 Saudi Arabian citizens in the United States for training related to security cooperation and arms purchases. That represented 16% of the total number of foreign students (from 153

countries) participating in such programs as of December 2019. *See* App. 31a–32a (¶¶ 40–43).[2]

One of those programs is the Security Cooperation Education and Training Program (SCETP). As part of a multibillion-dollar contract between the United States and Saudi Arabia, the United States agreed to provide avionics education and flight training to officers in the Royal Saudi Air Force (RSAF)—much of which was based out of NAS Pensacola. Under the Standard Terms and Conditions governing contracts like the one between the United States and Saudi Arabia, the foreign government must agree to indemnify and hold harmless the U.S. government, its agents, officers, and employees with respect to any

---

2.  In granting the Kingdom's motion to dismiss, the district court did not make any factual findings—and instead concluded that appellants' "jurisdictional allegations" were "facially insufficient to support the asserted statutory exceptions and overcome presumptive immunity as a matter of law." App. 263a.

For purposes of this appeal, this Court must therefore "accept[] the factual allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff[s]." *Quality Auto Painting Ctr. of Roselle, Inc.* v. *State Farm Indemnity Co.*, 917 F.3d 1249, 1257 (11th Cir. 2019) (en banc). The Statement of the Case thus relies heavily on the allegations in appellants' complaint, *see* App. 13a–184a, and provides appropriate citations to the relevant paragraphs thereof.

and all loss or liability (whether in tort or in contract) which might arise in connection with the agreement. *Id.* at 32a–37a (¶¶ 44–61).

The foreign state is also required to follow strict policies and procedures designed to ensure the safety of the United States and its citizens when it vets and selects program participants and thereafter—including the provision of a supervising officer—the CLO—to supervise their personnel while they are in the United States, and to ensure that those personnel remain in compliance with the relevant laws and regulations of the foreign state; the rules set out in the contract between the foreign state and the United States; and all applicable local laws and regulations. *Id.* at 37a–39a (¶¶ 62–68).

Among those policies and procedures are a series of security screening and vetting protocols that the contracting nation must implement and carry out before individual program participants can receive an Invitational Travel Order and a visa to come to the United States. Saudi Arabia represented that Al-Shamrani had cleared those protocols and submitted a DS-160 Online Nonimmigrant Visa Application on his behalf—many of the answers to which were false, and which the Kingdom knew or should have known to be false. Shortly

thereafter, Al-Shamrani received an A-2 visa—a category reserved for "foreign government officials." *See id.*

### 2. <u>Al-Shamrani and the December 6 Attack</u>

Al-Shamrani was born in 1998 and was raised in a region of Saudi Arabia known for its strict interpretation of Islam and Salafi fundamentalism. He became active on Twitter in 2012, using an account with his first and last name that was easily traceable to him. By 2015, Al-Shamrani was following religious extremists and hardline clerics on Twitter, and his Twitter account showed significant evidence of radicalization and anti-American sentiment. And according to subsequent investigations, by 2015, Al-Shamrani had already made contact with operatives from AQAP. *See id.* at 59a–61a (¶¶ 126–33).

The Kingdom admitted Al-Shamrani into the RSAF Academy in 2015. Appellants alleged, based on citations to numerous public sources, media accounts, and official reports, that the Kingdom regularly engages in extensive physical and digital surveillance of its own citizens, especially those in (or seeking admission to) the military. Thus, appellants alleged that, at least by the time it admitted Al-Shamrani into the RSAF Academy, the Kingdom would have known of Al-

Shamrani's radicalization and anti-American sentiments—which were publicly associated with a Twitter account bearing his name and were regularly shared with Al-Shamrani's friends and family. *See id*. at 52a–59a (¶¶ 107–25).

Al-Shamrani was nevertheless selected by the Kingdom to serve in the RSAF. Throughout Al-Shamrani's tenure in the RSAF, he regularly posted radical fundamentalist ideology on his social media accounts. He also posted anti-American and anti-Jewish ideology to social media and commented on (and encouraged others) to post radical Islamic sentiments online. And yet, of the hundreds of students in his RSAF Academy class, Al-Shamrani was one of **two** the Kingdom selected to receive a scholarship and enter the SCETP—the specific joint military training program at issue here. *Id*. at 61a–63a (¶¶ 134–47).

The Kingdom paid for Al-Shamrani to travel to (and spend one year learning English at) Lackland Air Force Base in Texas before he was transferred, in 2018, to NAS Pensacola, to receive the aviation and weapons officer training at the heart of the SCETP. In July 2019, Al-Shamrani obtained a Florida state hunting license, which he used to buy a Glock 45 9-millimeter pistol (under a federal hunting license

exception). Al-Shamrani also purchased hundreds of rounds of 9-millimeter ammunition. Al-Shamrani stored the pistol, the extended clips, and the ammunition in the RSAF officer barracks on NAS Pensacola. And he carried the pistol and ammunition around NAS Pensacola in his pilot helmet bag from July 2019 to December 6, 2019. All of this was in direct violation of both Saudi and U.S. rules, which expressly prohibit international military students such as Al-Shamrani from owning a firearm. *Id.* at 63a–64a (¶¶ 148–55).

The Saudi CLO knew that Al-Shamrani had a weapon and significant ammunition in violation of both U.S. and Saudi policy. The other Saudi trainees stationed at NAS Pensacola also knew that Al-Shamrani had a weapon and ammunition on base in violation of both U.S. and Saudi policy. Even though the CLO had a duty to enforce those rules and regulations, he chose not to. He also refused to attend the Navy's weekly progress reviews covering his subordinates, and he abandoned his post on September 21, 2019—returning to Saudi Arabia without identifying any replacement or relief for his role. Among other things, the CLO's absence meant that he was not present to perform the regular inspections of the trainees' barracks that appellants alleged

were required—inspections that would, presumably, have turned up (and resulted in the confiscation of) Al-Shamrani's prohibited firearm and ammunition. Although Saudi Arabia was aware of the CLO's unscheduled departure, it declined to provide a replacement CLO until January 2020—approximately one month after the December 6 attack. Thus, there was **no** Saudi officer supervising the trainees at NAS Pensacola for the last 11 weeks leading up to the attack. *See id.* at 64a–65a (¶¶ 156–59); *see also id.* at 67a–71a (¶¶ 169–86) (on the CLO's duties and unauthorized disappearance).

On September 11, 2019, Al-Shamrani publicly posted an ominous message on social media, stating that "the countdown has begun." Later that month, he wrote out a will purporting to explain his forthcoming attack, saved it using the Notes app on his iPhone, and sent a copy to senior leaders of AQAP. Appellants alleged that AQAP was working with Al-Shamrani to plan the attack and maximize U.S. casualties. In November 2019, Al-Shamrani traveled with a group of RSAF trainees to visit the September 11 memorial in New York City. The leave was not authorized or sanctioned—and was in direct violation of U.S. and Saudi policy. Appellants alleged below that the Saudi government, which

conducts extensive live surveillance of the cellphones of those participating in foreign military training, was aware of this unauthorized travel at the time. *See id*. at 65a–66a (¶¶ 160–64); *see also, e.g.*, *id*. at 58a (¶ 124) ("Saudi citizen[s'] mobile phones were being tracked as they travelled through the U.S. as often as two to thirteen (13) times per hour.").

On December 5, 2019 (the night before the attack), Al-Shamrani hosted a dinner party for fellow RSAF trainees at the RSAF barracks on base at NAS Pensacola. During the evening, Al-Shamrani screened videos of mass shootings and discussed his plan to commit the attack the following day. One of the RSAF trainees who attended the dinner called in sick the morning of the shooting. Instead of attending flight training, he stood outside Building 633 and recorded the shooting on his cell phone. Two other RSAF trainees who attended the dinner party also called in sick the morning of the shooting. They watched the attack from a nearby car. None of these other RSAF personnel did anything to stop Al-Shamrani or report his conduct to superiors. Indeed, without a CLO onsite, there was no immediate superior to whom they could report. *See id*. at 66a (¶¶ 165–68).

On the morning of December 6, 2019, Al-Shamrani entered Building 633 at NAS Pensacola wearing his RSAF uniform—a uniform that allowed him to enter the facility without challenge; to roam throughout the building unmolested; and to identify the location of individuals within the building before he began the attack. Shortly thereafter, he shot and murdered three American servicemen and shot and severely wounded six other servicemen and women; two sheriff's deputies; and a federal police officer. Al-Shamrani fired hundreds of rounds of ammunition during the attack—not only shooting at unarmed military personnel and law enforcement responders (four of whom he wounded), but also at photographs of then-President Trump and former President George H.W. Bush. Al-Shamrani was struck by multiple gunshots in an exchange with law enforcement responders—and died from his wounds. *Id.* at 71a–77a (¶¶ 187–213).

### 3.  <u>The Investigations into the December 6 Attack</u>

As part of its investigation into the December 6 attack, the FBI recovered Al-Shamrani's cell phones and computer data—which, among other things, revealed his frequent communications with AQAP. The FBI and Attorney General Barr later concluded that the shooting was

an act of terrorism motived by jihadist ideology. Attorney General Barr announced that the investigation uncovered that 21 Saudi trainees possessed "derogatory material" in violation of U.S. and Saudi rules and regulations. Seventeen of the trainees had social media accounts linked to anti-American or jihadi content, and 15 (including some of the 17 linked to anti-American content) had other illicit material in their possession. As a result, 21 Saudi military trainees were terminated from the program and sent back to Saudi Arabia within days of the attack. *Id.* at 97a–98a (¶¶ 320–22).

AQAP claimed responsibility for the NAS Pensacola attack on February 2, 2020. The video claiming responsibility included specific details and photographs that could only have been provided by Al-Shamrani. For example, the video mentions specific physical testing that Al-Shamrani would have had to undergo during his training. The video also includes pictures of Al-Shamrani that could have only been provided to AQAP by Al-Shamrani, along with screenshots (and the terms) of Al-Shamrani's will. The FBI confirmed that the will in the video is the same as the one Al-Shamrani had on his phone. AQAP's ability to obtain a copy of Al-Shamrani's will is evidence that he

communicated directly with the group in the days prior to the attack. AQAP also obtained non-public surveillance photos of NAS Pensacola from Al-Shamrani. Appellants alleged that the Saudi government knew or should have known about those communications and that the CLO would have been aware of this behavior had he been on site and performing his mandatory duties. *See id*. at 99a–100a (¶¶ 326–29).

Finally, in the aftermath of the attack, the Saudi government, through both King Salman bin Abdulaziz Al Saud and its ambassador to the United States, made specific representations concerning compensation for the victims. As then-President Trump relayed, "the King will be involved in taking care of the families and loved ones. He feels very strongly. He is very very devastated by what happened, what took place, likewise the Crown Prince. They are devastated by what took place in Pensacola. And I think they are going to help out the families very greatly." *Id*. at 101a (¶ 337). Congressman Gaetz, whose district includes NAS Pensacola, provided a declaration in the district court memorializing a similar representation made to him by Princess Reema bint Bandar Al Saud, the Saudi ambassador to the United States. *See* App. 297a (decl. of Rep. Matthew Louis Gaetz II) ("The

Princess made specific reference to the Kingdom's understanding that it would participate in financial compensation for the victims of the terrorist attack.").

### 4.   <u>**This Lawsuit**</u>

Appellants, the victims of the December 6 attack, their family members, and their estates, filed this lawsuit in the Pensacola Division of the U.S. District Court for the Northern District of Florida on February 22, 2021. The suit names the Kingdom as defendant and pleads 19 counts for relief, 18 of which sound in tort. The complaint alleges both intentional and unintentional torts—committed by Al-Shamrani; an array of Kingdom officials and agents (the names of whom are presently unknown); and the Kingdom itself, both directly and as *respondeat superior* for the scope-of-employment torts of its officials and agents. The complaint also states a claim for breach of the contract between the United States and Saudi Arabia—with appellants as third-party beneficiaries. *See id.* at 178a–81a (¶¶ 582–601).[3]

---

3.  For ease of reference, appellants have included, at the end of this section, a chart setting out: (1) the 19 causes of action; (2) the pleaded theories of the Kingdom's liability for each cause of action; and (3) the exception(s) to the Kingdom's sovereign immunity that appellants are invoking with respect to each cause of action. *See post* at 21.

In the district court, the Kingdom moved to dismiss the entire suit, and appellants moved for limited jurisdictional discovery. Judge Rodgers referred both motions to Magistrate Judge Bolitho. On May 11, 2023, Judge Bolitho filed a report and recommendation (R&R) in which he recommended that appellee's motion to dismiss be granted and that appellants' motion for jurisdictional discovery be denied. *See id*. at 186a.

While appellants' objections to the R&R were pending, Judge Rodgers invited the United States to file a statement of interest under 28 U.S.C. § 517. The United States declined. On March 30, 2024, Judge Rodgers issued an opinion and order adopting Judge Bolitho's R&R; denying appellants' motion for jurisdictional discovery; and granting the Kingdom's motion to dismiss. Judge Rodgers declined to reach any of the Kingdom's "factual" challenges to the complaint, because "the jurisdictional allegations are facially insufficient to support the asserted statutory exceptions and overcome presumptive immunity as a matter of law." *Id*. at 263a.

Instead of proceeding through the complaint on a claim-by-claim basis, Judge Rodgers structured her analysis rather awkwardly— analyzing the applicability of each of the pleaded FSIA exceptions by

reference to **some** of the causes of action to which appellants claimed they apply. With regard to the non-commercial tort exception to the FSIA, for instance, Judge Rodgers identified two general reasons why, in her view, the exception did not apply.

First, she concluded that the Kingdom's allegedly tortious conduct fell within the "discretionary function" carveout to the FSIA's "non-commercial tort" exception—because, in her view, "no United States federal statute or military regulation or policy mandates conduct by Saudi Arabia or the CLO in these areas, and supervision and training are the type of duties that require the exercise of judgment and policy-level decisions subject to protection under the discretionary function exception." *Id.* at 283a.

Second, she held in the alternative that the underlying torts in any event did not "occur[] in the United States" because "Saudi Arabia's alleged failure to supervise Al-Shamrani during the months preceding the attack did not take place entirely within the United States because the CLO had returned to Saudi Arabia and was no longer present on base." *Id.* at 283a n.33.

Judge Rodgers also rejected the application of JASTA's exception to foreign sovereign immunity—concluding that Al-Shamrani committed the attack **outside** the scope of his employment; that JASTA does not encompass acts of omission; and that appellants' allegations "were insufficient to establish proximate cause between Saudi Arabia's conduct and the NAS Pensacola attack." *Id*. at 264a–80a.

And with regard to appellants' request for jurisdictional discovery on these and other points, including whether Saudi Arabia had waived its immunity through its contractual agreements with the United States, Judge Rodgers concluded that appellants were not entitled to see the actual contract between the United States and the Kingdom—to determine if the Kingdom had waived its sovereign immunity with regard to any of appellants' claims—because there is no explicit waiver of sovereign immunity in the standard, generic Letter of Offer and Acceptance (LOA). *See id*. at 288a–91a.

This timely appeal followed.

### 5.  Chart of Appellants' Claims / Applicable FSIA Exceptions

| COUNT NUMBER: CLAIM FOR RELIEF | THEORIES OF KSA'S LIABILITY | | APPLICABLE EXCEPTIONS TO IMMUNITY UNDER FSIA | | |
|---|---|---|---|---|---|
| | Direct | Vicarious | Non-commercial tort | JASTA | Waiver |
| 1: Vicarious liability / *respondeat superior* | | X | X | X | X |
| 2: ATA—Harboring or concealing terrorists | X | X | | X | |
| 3: ATA—Providing material support to terrorists | X | X | | X | |
| 4: ATA—Providing material support to designated FTO | X | X | | X | |
| 5: ATA—Prohibited financing of terrorism | X | X | | X | |
| 6: ATA—Aiding and abetting act of international terrorism | X | X | | X | |
| 7: Loss of solatium | X | X | | X | |
| 8: Assault | | X | X | | |
| 9: Battery | | X | X | | |
| 10: False imprisonment | | X | X | | |
| 11: Intentional infliction of emotional distress | | X | X | | |
| 12: Florida hate crimes statute | X | X | X | | |
| 13: Florida civil remedy for terrorism | X | X | X | | |
| 14: Negligence and gross negligence | X | X | X | X | |
| 15: Negligent infliction of emotional distress | X | X | X | | |
| 16: Florida wrongful death | X | X | X | X | |
| 17: Florida survival action | X | X | X | | |
| 18: Loss of consortium | X | X | X | | |
| 19: Breach of contract / third-party beneficiaries | X | | | | X |

## SUMMARY OF ARGUMENT

The district court's errors in dismissing this case can be divided into four categories. First, the court identified the correct legal standard for whether appellants' claims fall within one of the FSIA's exceptions to the Kingdom's sovereign immunity, but then misapplied that standard—such as its conclusion that seeking to hold the Kingdom liable for non-commercial torts is negated by the FSIA's "discretionary function" exception because, in its view, appellants' tort claims are all foreclosed because they relate to the supervision of employees.

Second, the court made errors of law in identifying what the relevant FSIA provisions require in the first place—such as its holding that JASTA's exception to foreign sovereign immunity requires the underlying act of international terrorism to be committed within the scope of the perpetrator's employment. (The statute's plain text and unambiguous purpose are indisputably to the contrary.)

Third, the court held appellants to a higher pleading burden at the motion-to-dismiss stage than binding precedent allows—such as requiring appellants to overcome, at the pleading stage, the Kingdom's denials with respect to its relationship with AQAP. And the fourth

category involves claims the court did not address **at all** before dismissing—such as appellants' causes of action under Florida's civil terrorism and hate crimes statutes, and their breach-of-contract claim.

These errors obfuscate the relatively straightforward nature of appellants' claims. This is not a case in which plaintiffs are seeking to hold a foreign sovereign liable through tenuous, multi-step chains of causation involving numerous intermediaries and intervening events. Here, a Saudi military officer, while in uniform and on duty in the United States, committed an act of international terrorism (and a host of torts), none of which could have been committed **but for** his official employment by a foreign sovereign. More than that, appellants have plausibly alleged, in detail, not only that the Kingdom indirectly facilitated Al-Shamrani's tortious and terroristic conduct simply by employing him, but that it **directly** facilitated it through its officials and agents by selecting him for the SCETP; by misrepresenting his background (and its vetting thereof) in his application; by enabling his continuing participation in the program even as he showed more signs of radicalization; and by providing support, through multiple channels, for the specific foreign terrorist organization that claimed responsibility

for Al-Shamrani's attack. If foreign sovereigns can't be held liable in U.S. courts based upon the well-pleaded allegations in appellants' complaint, it is difficult to imagine any tortious or terroristic conduct for which they could be—notwithstanding Congress's clear goals of opening courthouse doors in the FSIA, and expanding such liability in JASTA.

Thus, the upshot of these errors—and the analysis that follows—is that appellants are entitled to reversal and remand with respect to the dismissal of most—if not all—of the 19 claims pleaded in the complaint. Some of those claims should have survived a motion to dismiss on their face; others, at the very least, were sufficiently well-pleaded to require limited jurisdictional discovery before they could be dismissed. The one point that cannot be gainsaid, though, is that dismissal of appellants' **entire** suit, at this juncture, was procedurally and legally indefensible.

## ARGUMENT

The structure of the FSIA is well-settled and familiar. That statute "supplies the ground rules for obtaining jurisdiction over a foreign state in the courts of this country. The FSIA creates a baseline of immunity from suit, and, unless a specified exception applies, a federal court lacks subject-matter jurisdiction over **a claim** against a

foreign state." *Global Marine Exploration, Inc.* v. *Republic of France*, 33 F.4th 1312, 1318 (11th Cir. 2022) (cleaned up) (emphasis added).

Critically, as *Global Marine Exploration* underscores, the FSIA's exceptions are **claim**-specific—meaning that the question in any case in which the FSIA is invoked is whether each claim pleaded by the plaintiffs falls within one of the exceptions to foreign sovereign immunity Congress provided in the statute. *See, e.g.*, *Rodriguez* v. *Pan Am. Health Org.*, 29 F.4th 706, 714 (D.C. Cir. 2022) ("FSIA immunity determinations [are considered] on a claim-by-claim basis." (cleaned up)); *Broidy Capital Mgmt., LLC* v. *State of Qatar*, 982 F.3d 582, 590 n.2 (9th Cir. 2020) (same).

In other words, under 28 U.S.C. § 1330(a), federal courts have subject-matter jurisdiction over a plaintiff's claim if **any** of the FSIA's exceptions apply to it. *See Butler* v. *Sukhoi Co.*, 579 F.3d 1307, 1312–13 (11th Cir. 2009) (citing *Mwani* v. *bin Laden*, 415 F.3d 1, 15 (D.C. Cir. 2005)). Thus, dismissal of an entire lawsuit for lack of subject-matter jurisdiction under the FSIA—the disposition the district court adopted here—is appropriate if and only if no FSIA exception applies to even a **single** claim pleaded by the plaintiffs.

Instead of proceeding on a claim-by-claim basis, however, the district court structured its analysis by considering the four FSIA exceptions invoked by appellants as applied to the district court's vague framing of the claims in appellants' complaint. That misbegotten approach led directly to one set of reversible errors—in which the district court never specifically addressed or analyzed many of appellants' pleaded causes of action. It also compounded a second set of errors—in which the analysis the district court **did** provide focused either on the wrong causes of action; applied the wrong standard to the correct causes of action; or applied the correct standard to an incomplete assessment of the correct causes of action.

Rather than reinventing the wheel by going claim by claim, appellants' analysis below parallels the district court's exception-by-exception framing—demonstrating which of appellants' causes of action should have been allowed to proceed with respect to each of the preserved FSIA exceptions.

## I.    THE DISTRICT COURT ERRED IN HOLDING THAT NONE OF APPELLANTS' CLAIMS FALL WITHIN THE FSIA'S NON-COMMERCIAL TORT EXCEPTION

Under the FSIA's "non-commercial tort" exception, a foreign sovereign shall not be immune from liability for torts "occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5). The exception itself has two carve-outs (often described, unhelpfully, as "exceptions"): a foreign sovereign retains immunity if the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused," *id*. § 1605(a)(5)(A), or if it is a claim "arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *Id*. § 1605(a)(5)(B). Only the first carve-out is at issue here.

In their complaint, appellants plausibly alleged that Saudi Arabia is liable for an array of torts that, in appellants' view, fall within the non-commercial tort exception. Among others, appellants pleaded claims against the Kingdom for assault; battery; false imprisonment;

28

intentional infliction of emotional distress; negligence & gross negligence; negligent infliction of emotional distress; wrongful death; loss of consortium; and violations of Florida's civil hate-crimes and terrorism statutes. Some of those tort claims arise directly from the December 6 attack; others arise from the Kingdom's role in vetting Al-Shamrani and selecting him for the training program in the first place—and then facilitating his participation thereafter. In all, 12 of the complaint's 19 counts arguably fall within the non-commercial tort exception—Count One and Counts Eight through Eighteen. *See ante* at 21.

The district court identified two reasons why, in its view, the non-commercial tort exception did not generally apply. First, it concluded that appellants' claims fall into the FSIA's carve-out for discretionary functions—holding that, because appellants' claims relate to the "hiring and supervision of employees," they necessarily implicate discretionary functions. App. 281a.

Second, it concluded that, even if the carve-out for discretionary functions did not apply, the actual torts for which appellants are suing the Kingdom did not "occur[] in the United States." *Id.* at 283a n.33.

Because both of those legal conclusions are incorrect, the district court wrongly dismissed those of appellants' claims that depend upon the applicability of the FSIA's non-commercial tort exception.

### A. The District Court Wrongly Held that the Kingdom Had Discretion to Shirk Its Mandatory Duties

In holding that the non-commercial tort exception does not apply to appellants' claims, the district court relied upon the "discretionary function" carve-out to the non-commercial tort exception, and a series of cases holding that "decisions related to the hiring and supervision of employees are discretionary functions." *Id*. at 281a. But in the analogous context of the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a),[4] this Court has made clear that the analysis is not supposed to be pitched at nearly so high a level of generality. Instead, whether a government officer's **specific** decisions "fall within the discretionary function exception" to the FTCA "turns . . . on whether the judgments involved are grounded in policy

---

4. Courts have read the discretionary function carve-out to the FSIA's non-commercial tort exception to be *in pari materia* with the discretionary function exception to the FTCA—which Congress borrowed from when it adopted the FSIA. *See O'Bryan* v. *Holy See*, 556 F.3d 361, 383 (6th Cir. 2009).

considerations," not just some abstraction about the general type of conduct at issue. *Ochran* v. *United States*, 117 F.3d 495, 501 (11th Cir. 1997). And even if there might be discretion to choose whether to undertake a particular responsibility at the outset, once the government chooses to accept mandatory duties, it has no discretion to shirk them. *See, e.g.*, *Swafford* v. *United States*, 839 F.3d 1365, 1372 (11th Cir. 2016) ("[O]nce the [Army] Corps [of Engineers] exercised its discretion to build **and** maintain the stairs, failure to maintain them in a safe condition is simply not a permissible exercise of policy judgment.").

Here, the complaint alleged breaches of **dozens** of mandatory duties imposed on both the Kingdom and its officers—by the underlying contract; by U.S. laws and regulations; and by Saudi laws and regulations. Although this list is not exclusive, they include that:

- The Kingdom was required to conduct a security screening of applicants to the SCETP, *see* App. 37a–38a, 62a, 151–60a;

- The Kingdom was required to complete Al-Shamrani's International Travel Order and visa application paperwork correctly and truthfully, *see id.* at 37a–38a, 62a, 151–59a;

- The Kingdom and its officers were required to comply with U.S. policies and procedures governing access to military bases (including screening for those with ties to terrorism or adherence to extremist ideologies), and to certify that

participating trainees did not constitute a security risk to the United States, *see id.* at 151a–60a;

- Private firearms possession on NAS Pensacola was strictly prohibited by both Kingdom and U.S. Navy rules, *see id.* at 64a; and

- The CLO, on behalf of the Kingdom, was required to be on site; to monitor all of the trainees in the program; to ensure their compliance with all relevant rules and regulations (and report non-compliance); to assist in routine inspections of trainees and their assigned quarters; and to report to both U.S. and Kingdom personnel any issues relating to or arising from the trainees. *Id.* at 64a–71a.[5]

Critically, none of these mandates invested Al-Shamrani, other Kingdom personnel, or the Kingdom itself with any discretion to make judgments "grounded in policy considerations." There was no discretion to fail to adequately vet Al-Shamrani or to file misleading paperwork respecting his participation in the SCETP. There was no discretion to fail to conduct the required screening—or to certify Al-Shamrani's eligibility given what the Kingdom knew or should have known about

---

5. The district court asserted that provision of a CLO was not mandated. App. 283a. But even if that assertion (which is contrary to the complaint's plausible allegations) is true, the complaint in any event alleges that, **once** the Kingdom provided a CLO, the CLO necessarily took on a number of mandatory duties. *See, e.g., Carlyle* v. *U.S. Dep't of the Army*, 674 F.2d 554, 557 (6th Cir. 1982) ("The plaintiff's argument [that the absence of supervision was not a discretionary function under the FTCA] might be meritorious if the Army had in fact decided to place a supervisor in the Hotel only to have that person leave his post.").

his background. There was no discretion to facilitate his continuing participation in the program despite the information the Kingdom knew or should have known about Al-Shamrani's growing radicalization and increasingly ominous public social media posts. There was no discretion for the CLO to simply abandon his post and cease ensuring that Al-Shamrani and the other RSAF trainees were complying with the applicable rules and regulations. And there was, quite obviously, no discretion on Al-Shamrani's part to commit the intentional torts comprising the December 6 attack itself.

In all, **none** of these actions reflected judgments as to the wisdom of specific policies—by the Kingdom or any of its officials or agents. *See generally Berkovitz* v. *United States*, 486 U.S. 531, 537 (1988) ("The [discretionary function] exception, properly understood, . . . protects only governmental actions and decisions based on considerations of public policy."). And yet, in the face of all of these plausible allegations, the district court concluded that, "[w]hile these [materials] may have imposed obligations on Al-Shamrani as a student and contemplated that a CLO may be assigned to assist trainees, they do not mandate conduct by Saudi Arabia." App. 283a.

In reaching that conclusion, the district court simply ignored most of the mandatory duties the complaint alleged (and their breaches); repeatedly under-described appellants' allegations respecting those duties; and erred even with respect to those duties that it **did** consider. The CLO's failure to carry out his mandatory duties was, as the complaint alleges, just the **last** duty the breach of which caused the December 6 attack. It was by no means the first or only breach of such a duty that appellants have plausibly alleged in this case. Because the Kingdom's failures to abide by its numerous mandatory duties "cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." *Berkovitz*, 486 U.S. at 536.

Indeed, the idea that the Kingdom or its officials or agents had any discretion in this case "really does not reckon with the extraordinary nature of the allegations made by plaintiff in this case. What plaintiff is alleging is conduct of such a serious and malevolent nature as to be beyond any reasonable discretion on the part of a Government agency." *Glickman* v. *United States*, 626 F. Supp. 171, 175

(S.D.N.Y. 1985).[6] Thus, none of appellants' claims fall within the discretionary function carve-out to the non-commercial tort exception.

### B.  Most of the Kingdom's Breaches (and Those of Its Officials and Agents) "Occurr[ed] in the United States"

In the alternative, the district court held, in a cryptic footnote, that the non-commercial tort exception did not apply because the "entire tort" did not "occur[] in the United States." Specifically, "Saudi Arabia's alleged failure to supervise Al-Shamrani during the months preceding the attack did not take place entirely within the United States because the CLO had returned to Saudi Arabia and was no longer present on base." App. 283a n.33.

There are at least three problems with this analysis. First, as noted above, the complaint alleges far more than that the Kingdom "fail[ed] to supervise Al-Shamrani." The complaint alleges that the

---

6.  Taken to its logical conclusion, the district court's holding that the Kingdom had discretion to not comply with these obligations is, in essence, a holding that the Kingdom was free to misrepresent the background of an SCETP applicant; to pay for the applicant to travel to and live in the United States; and to facilitate his participation in the SCETP, all while **knowing** that he posed a potentially lethal threat to those to whom his participation in the SCETP exposed him.

There is no reason to believe that the United States ever agreed, or would have agreed, to give a foreign sovereign the discretion to send a terrorist into the United States for military training.

Kingdom affirmatively enabled and repeatedly facilitated Al-Shamrani's tortious conduct even after it chose him for the RSAF, and, later, the SCETP—both directly and through the actions of its officers and agents, including the CLO and Al-Shamrani's fellow RSAF trainees. *See ante* at 9–14.

Second, insofar as the Kingdom and its officers and agents (including the CLO) had duties relating to Al-Shamrani's continuing presence and behavior **on** NAS Pensacola, and allegedly facilitated his wrongful conduct there, those breaches took place **on** NAS Pensacola—not wherever the CLO happened to be instead. The district court all-but admitted as much—citing to the Sixth Circuit's decision in *O'Bryan* for the proposition that "the noncommercial tort exception was met for liability premised on supervisors who were located within the United States." App. 283a n.33 (citing *O'Bryan*, 556 F.3d at 387). If the underlying torts arise from the shirking of duties that were to be carried out in the United States, it would turn the "entire tort" rule on its head to focus on where the tortfeasors actually were at the relevant time, as opposed to where their duties required them to be.

Third, because **many** of the torts pleaded in the complaint unquestionably occurred within the United States (such as the intentional torts comprising the December 6 attack itself), the "entire tort" rule is necessarily satisfied at least as to those torts—and perhaps as to all of them. Indeed, although this Court has not addressed the matter, the Ninth Circuit has held that, for purposes of the FSIA, the "entire tort" rule requires only that **one** "entire tort" pleaded in a complaint "occur[] in the United States." *See Broidy Capital*, 982 F.3d at 588 (quoting *Olsen ex rel. Sheldon* v. *Gov't of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984)).[7] Thus, if plaintiffs bring multiple related non-commercial tort claims against a foreign sovereign, the exception is satisfied so long as at least one of them took place completely within the United States. Were the rule otherwise, the Ninth Circuit explained, that "would encourage foreign states to allege that **some** tortious conduct occurred outside the United States" solely in order to defeat

---

7.  As *Broidy Capital* noted, *Olsen* was abrogated on other grounds by the subsequent decision in *Joseph* v. *Office of Consulate General of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987). *See* 982 F.3d at 588. But *Joseph* abrogated *Olsen*'s discussion of discretionary functions, **not** the "single tort" rule, *see* 830 F.3d at 1026—as reinforced by *Broidy Capital*'s recent rearticulation of it.

their liability. *Olsen*, 729 F.2d at 646 (emphasis added). Nothing in the FSIA's text or context suggests that Congress intended to create such perverse incentives.

Here, there is little dispute that multiple "entire torts" pleaded by the appellants "occurr[ed]" **entirely** "in the United States." At bottom, the intentional torts arising out of the December 6 attack took place "in the United States." Under the Ninth Circuit's "single tort" reading, that should be enough. But even analyzing each tort independently, the complaint also pleads numerous causes of action relating to Al-Shamrani's earlier conduct while in the United States—conduct that the Kingdom facilitated through the CLO's non-compliance with his mandatory duties and the misconduct of other Saudi officials within the United States—including Al-Shamrani's fellow RSAF trainees. *See ante* at 9–14. Even under a more parsimonious standard than the Ninth Circuit's "single tort" approach, those tort claims that arose within the United States would **still** satisfy the non-commercial tort exception— and thus should have survived the Kingdom's motion to dismiss.

Thus, under the "single tort" rule, the Kingdom's motion to dismiss based upon the inapplicability of the non-commercial tort

exception should simply have been denied. But even without applying the "single tort" rule, appellants have plausibly alleged that numerous torts "occurr[ed] in the United States" based upon the duties the complaint alleges numerous Saudi officials had while stationed (and living) on U.S. soil. Those allegations should, at a minimum, have sufficed to warrant jurisdictional discovery to establish exactly what those officials knew; what they did; and, critically, **where** they did it.

Either way, the district court erred. It erred by never explaining why appellants' intentional tort claims directly arising from the December 6 attack fall outside the non-commercial tort exception. It erred by holding that the Kingdom had discretion to refuse to comply with **all** of the mandatory duties imposed by the relevant rules and regulations. And it erred in holding that all of the torts pleaded by appellants relating to the Kingdom's facilitation of Al-Shamrani's attack occurred outside the United States. The district court thus erred by dismissing Count One and Counts Eight through Eighteen of appellants' complaint.

## II. THE DISTRICT COURT ERRED IN CONCLUDING THAT NONE OF APPELLANTS' CLAIMS FALL WITHIN JASTA'S EXCEPTION TO FOREIGN SOVEREIGN IMMUNITY

The district court's errors with respect to the non-commercial tort exception arose from a conflation of the distinct torts alleged in the amended complaint and from misapplications of the relevant doctrinal standards. But the district court's errors with respect to JASTA's exception to foreign sovereign immunity were even more fundamental. Indeed, were the district court's analysis of JASTA to be affirmed, it would be all-but impossible for victims of terrorist attacks to ever successfully invoke its exception to the FSIA.

JASTA was enacted (over President Obama's veto) in 2016 in response to lower-court rulings that had adopted, in Congress's view, too narrow a reading of the non-commercial tort exception's "entire tort" rule in the lawsuit seeking to hold the Kingdom liable for its alleged role in indirectly helping to facilitate the September 11 attacks through its support of al Qaeda. *See In re Terrorist Attacks on Sept. 11, 2001*, 134 F. Supp. 3d 774 (S.D.N.Y. 2015), *vacated*, No. 15-3426, 2017 WL 8776686 (2d Cir. Feb. 7, 2017) (mem.). Instead of watering down the "entire tort" rule, though, Congress chose to craft a new, terrorism-specific exception to foreign sovereign immunity. *See id.*

Indeed, the text of the statute is explicit about Congress's purpose:

to provide civil litigants with the **broadest possible basis**, consistent with the Constitution of the United States, to seek relief against persons, entities, **and foreign countries**, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."

Justice Against Sponsors of Terrorism Act of 2016, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (codified at 18 U.S.C. § 2333 note) (emphases added). JASTA thus sought to significantly expand the direct and indirect liability of foreign sovereigns for acts of international terrorism on U.S. soil.

Here, appellants have brought five causes of action under the Anti-Terrorism Act, 18 U.S.C. §§ 2333–2339D, to which they alleged that JASTA's exception to foreign sovereign immunity applies—because Al-Shamrani (1) committed an act of international terrorism within the United States that (2) was caused by the tortious acts of the Kingdom or its agents while acting within the scope of their employment. *See* App. 108a–31a.[8]

---

8.  Appellants have also invoked JASTA's exception to the FSIA with respect to Count One (vicarious liability); Count Seven (loss of solatium); Count Fourteen (negligence & gross negligence); and Count Sixteen (Florida's wrongful death statute). *See ante* at 21. The district

The district court disagreed, making three independent errors of law. First, it wrongly required that Al-Shamrani's act of international terrorism occur within the scope of his employment, and not just that the Kingdom's (or its agents') tortious acts so occur. The plain text of JASTA is clear that, so long as a plaintiff's injuries are caused by **both** an "act of international terrorism" and a foreign sovereign's (or its officer's or agent's) scope-of-employment tort, the foreign sovereign's immunity is defeated. Here, appellants have plausibly alleged both of those elements, so JASTA's predicates are satisfied.

Second, the district court held that appellants' claims fall outside JASTA's exception insofar as they are based upon acts of omission. But once again, the district court erred by focusing on the wrong causes of action in appellants' amended complaint—and pitching the complaint at too high a level of generality. Appellants' ATA claims allege that the Kingdom knowingly (indeed, affirmatively) supported terrorists and designated foreign terrorist organizations, and also engaged in

---

court provided **no** analysis to support its dismissal of Counts One, Seven, and Sixteen, and only briefly analyzed Count Fourteen.

prohibited financing of terrorism. Whatever else might be said about those claims, they are not based upon "omissions."

Finally, the district court held that plaintiffs had failed to plead facts sufficient to establish that the Kingdom actually **did** provide material support for Al-Shamrani's act of international terrorism. Leaving aside that this argument goes to the existence of a cause of action under the ATA, not the Kingdom's immunity under JASTA, the court failed to credit appellants' plausible allegations—again, largely by ignoring them. Even a modest perusal of the complaint, though, reveals myriad non-conclusory allegations that, if proven, would establish the Kingdom's material support to Al-Shamrani and to AQAP—support that easily satisfies JASTA's standard for causation. Taking these errors together, if the district court's stilted reading of JASTA were allowed to stand, it would be effectively impossible to ever successfully invoke it to overcome foreign sovereign immunity.

### A. Appellants Have Plausibly Alleged Numerous Scope-of-Employment Torts

The district court first held that JASTA's exception to foreign sovereign immunity did not apply because Al-Shamrani's act of international terrorism was not committed within the scope of his employment. That analysis incorrectly analyzed Al-Shamrani's commission of the December 6 attack under Florida scope-of-employment law.[9] But the far-more-glaring problem is that it analyzed the scope of **Al-Shamrani**'s employment in the first place. As the text of 28 U.S.C. § 1605B(b) makes clear, JASTA overrides a foreign state's

---

9.  For instance, the district court held that Al-Shamrani's "murderous attack . . . was so extreme as to be outside the scope of Al-Shamrani's RSAF employment as a matter of law." App. 270a. But extreme wrongfulness is not a controlling factor in scope-of-employment analysis. *See, e.g.*, *Rasul* v. *Myers*, 512 F.3d 644, 658–60 (D.C. Cir. 2008) (rejecting argument that torture necessarily falls outside of the scope of employment). Instead, the question is whether a military officer who was on a U.S. Naval Base for the purpose of on-the-job weapons training was acting within the scope of his employment when, while on duty and in uniform, he trained weapons on his hosts. *See, e.g.*, *Iglesia Cristiana La Casa del Señor, Inc.* v. *L.M.*, 783 So.2d 353, 357 (Fla. 3d DCA 2001) (intentional torts can still be within the scope of employment "where the tortfeasor was assisted in accomplishing the tort by virtue of the employer/employee relationship"); *see also Hennagan* v. *Dep't of Highway Safety & Motor Vehicles*, 467 So.2d 748, 750 (Fla. 1st DCA 1985) ("[C]onduct may be within the scope of employment, even if it is unauthorized, if it is of the same general nature as that authorized or is incidental to the conduct authorized.").

sovereign immunity "in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States" so long as the injury was caused by **both**:

(1) an act of international terrorism in the United States; **and**

(2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b) (emphasis added). In other words, the scope-of-employment requirement attaches to the tortious conduct of the foreign sovereign (or its officials or agents), **not** the predicate "act of international terrorism." *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 643 (S.D.N.Y. 2018) ("JASTA waives FSIA immunity for claims caused by the tortious acts of a foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency.").[10]

---

10.  As the district court also explained in *Terrorist Attacks*, "whereas the noncommercial tort exception waives immunity only for tortious acts committed by **officials** or **employees** of the foreign state, JASTA extends the waiver of immunity to tortious acts committed by [a foreign state's] **agents**." *Terrorist Attacks*, 298 F. Supp. 3d at 643.

This natural reading of the text also makes common sense: JASTA was enacted directly in response to unsuccessful efforts by the victims of the September 11 attacks and their families to hold Saudi Arabia accountable for its alleged role in supporting al Qaeda; the statute would have accomplished nothing at all if, for it to apply to the September 11 attacks, the hijackers themselves would have had to be Saudi government officers acting within the scope of their employment. Indeed, thankfully few acts of international terrorism are carried out by foreign government employees. That can hardly be said to be the category Congress was worried about when it wrote § 1605B(b).

Thus, the question for purposes of JASTA's exception to foreign sovereign immunity is not whether the December 6 attack was **itself** committed within the scope of Al-Shamrani's employment; it's whether the ATA claims appellants have pleaded relate to conduct within the scope of **any** of the Kingdom's officials' or agents' employment. And as this Court summarized in *Spencer* v. *Assurance Co. of America*, 39 F.3d 1146 (11th Cir. 1994), "Florida law requires that the conduct (1) must have been the kind for which the employee was employed to perform; (2) must have occurred within the time and space limits of his employment;

and (3) must have been activated at least in part by a purpose to serve the employment." *Id*. at 1150.

If, unlike how the district court approached the matter, analysis is focused on appellants' ATA claims, it becomes clear that the scope-of-employment test is easily satisfied. To take just one example, Count Four alleges that:

> Saudi Arabia provided material support to AQAP in violation of 18 U.S.C. § 2339B. It did so by providing weapons, training, funding and equipment to AQAP in Yemen. It further provided material support to AQAP by providing training, false documentation, facilities, transportation and expert advice and assistance to Al-Shamrani—a known AQAP operative. Saudi Arabia also provided material support to AQAP by purposefully, recklessly, or with a conscious disregard, failing to implement and/or execute security screening protocols and oversight of its RSAF candidates for training in the United States who were operatives or sympathizers of AQAP. In doing so, Saudi Arabia provided travel, transportation, training, safe haven, lodging, communications equipment and personnel to AQAP that was necessary to and reasonably related to the Attack committed by RSAF 2nd Lt Al-Shamrani.

App. 117a–18a. If true, all of this alleged conduct would have taken place within the official responsibilities of Saudi government officials or agents; within the time and space limits of their employment; and "at

least in part" to serve a purpose of that employment—to wit, the policy objectives of the Saudi government.

Nor are these allegations "conclusory"; far from merely providing rote recitations of the relevant legal standards, the complaint cites to numerous media accounts and other public sources on which the allegations are based—including congressional testimony; an Associated Press investigation; a RAND study; a *Washington Post* article, and so on. *See, e.g.*, *id.* at 47a–52a. And the allegations supporting appellants' other ATA claims are similarly supported. These sources may not **prove** appellants' allegations, but they demonstrate the extent to which they are neither conclusory nor speculative.

The district court thus doubly erred: it erred by wrongly analyzing whether Al-Shamrani's alleged ATA violations were committed within the scope of **his** employment; and it erred by not analyzing whether the ATA violations were committed within the scope of **any** of the Kingdom's officials' and agents' employment. Because appellants' ATA claims arose within the scope of employment of the Kingdom's officials and agents, at least that part of JASTA's exception to foreign sovereign immunity is satisfied.

## B. The District Court Erred in Holding that Appellants' JASTA Claims Relate Only to Acts of Omission

The district court also rejected applicability of JASTA's exception to foreign sovereign immunity by pointing to JASTA's carve-out for "an omission or a tortious act or acts that constitute mere negligence." 28 U.S.C. § 1605B(d). Here, once more, the district court misconstrued both appellants' complaint and the applicable law. All five of appellants' ATA claims allege affirmative violations of the ATA by the Kingdom—including harboring or concealing terrorists, in violation of 18 U.S.C. § 2339; providing material support to terrorists, in violation of 18 U.S.C. § 2339A; providing material support to designated foreign terrorist organizations, in violation of 18 U.S.C. § 2339B; financing terrorism, in violation of 18 U.S.C. § 2339C; and aiding-and-abetting acts of international terrorism, in violation of 18 U.S.C. § 2333(d). *See* App. 108a–31a.

Taking appellants' plausible allegations as true, these are no acts of omission or "mere negligence." Rather, they easily meet the standard that other courts have applied—under which § 1605B(d)'s carve-out is inapplicable so long as the tortfeasor's conduct was "knowing or with deliberate indifference." *In re Terrorist Attacks on Sept. 11, 2001*, No.

1:03-md-1570, 2023 WL 5132138, at *8 (S.D.N.Y. Aug. 10, 2023) (citing *In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010)).[11]

What the district court missed by failing to carefully analyze appellants' claims is that the predicate offenses that form the basis for each of the ATA claims **themselves** require at least that much of a showing; none of the criminal violations of the ATA can be established through "omission" or "mere negligence." It necessarily follows that § 1605B(d) does not foreclose jurisdiction over appellants' ATA claims.

---

11.  Because appellants' ATA claims do not allege liability based upon "omission" or "mere negligence," this Court need not correct another error by the district court—which assumed that JASTA's exclusion for "an omission or a tortious act or acts that constitute mere negligence" covers **any** claim based upon a failure to act. *See* App. 272a–73a & n.26.

There are countless examples in both criminal law and tort law of contexts in which a party's affirmative duties elevates their inaction from "omission" or "mere negligence" to affirmative civil or criminal liability. *See, e.g.*, *Twitter, Inc.* v. *Taamneh*, 598 U.S. 471, 489 (2023) ("[I]naction can be culpable in the face of some independent duty to act." (citing 1 WAYNE LaFAVE, SUBSTANTIVE CRIMINAL LAW § 6.1 (3d ed. 2018); and W. PAGE KEETON, DAN B. DOBBS, ROBERT E. KEETON, & DAVID G. OWEN, PROSSER AND KEETON ON TORTS 373–75 (5th ed. 1984)).

### C. The District Court Wrongly Dismissed Appellants' Allegations of the Kingdom's Material Support to AQAP as "Conclusory"

Similar errors pervaded the district court's conclusion that appellants failed to plausibly allege that the Kingdom "caused" their injuries. With regard to appellants' claim that the Kingdom provided material support to Al-Shamrani, the district court held that "there is no sufficient factual allegation from which to reasonably infer that Saudi Arabia knew Al-Shamrani was a terrorist intending to attack the United States." App. 275a. This applies the wrong test to a remarkably crabbed reading of the complaint.

First, 18 U.S.C. § 2339A prohibits the knowing provision of "material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" **any** of more than three-dozen different criminal offenses. There is no requirement in the statute that the provider of the prohibited support know either (1) the specific person who will carry out the underlying criminal act; or (2) what that specific criminal act is going to be. (Were it otherwise, the provider of the prohibited support would be liable as a principal for the predicate offense, and there would have been no need

for § 2339A.) Instead, all that appellants must show to state a claim under the ATA for a violation of § 2339A is that the Kingdom provided material support to Al-Shamrani knowing, **in general**, that it would be used (or was intended to be used) to carry out any one of the delineated offenses. Insofar as the complaint plausibly alleges that the Kingdom knew or should have known that it was providing material support to Al-Shamrani in light of what it knew about him when it sponsored him for the program and what it learned as it continued to support his participation therein, it more than satisfies that standard.

As for appellants' claim that the Kingdom provided material support to AQAP, specifically, the district court held that the complaint provides "no 'specific, non-conclusory allegations' that Saudi Arabia or any particular government employee or agent acting within the scope of his/her employment provided material support directly to AQAP, and certainly no allegation that any support was provided **for the planning of this or any attack in the United States**." App. 277a–78a. The emphasis (which is the district court's) only underscores its error. To establish a violation of 18 U.S.C. § 2339B (the predicate ATA violation for Count Four of the complaint), there is **no** requirement that the

defendant have known that its support was intended to aid a specific terrorist attack; all that the statute requires is proof the defendant knew it was providing material support to a designated foreign terrorist organization—regardless of where or why. *See, e.g.*, *Holder* v. *Humanitarian Law Proj.*, 561 U.S. 1 (2010).[12]

Indeed, Congress enacted § 2339B to provide for **broader** criminal and civil liability than the already existing § 2339A—at further temporal, geographic, and organizational remove from a specific act of international terrorism. *See, e.g.*, Robert Chesney, *The Sleeper Scenario:*

---

12. The district court defended its view that appellants had to show the Kingdom knew it was materially supporting acts of international terrorism **in the United States** by pointing to JASTA's requirement that the underlying act of international terrorism be committed here. *See* App. 278a ("This is incorrect for jurisdictional purposes under § 1605(b), **which requires injury in the United States**.").

Assuming that Judge Rodgers meant to cite to § 1605B (JASTA), rather than § 1605(b), her analysis on this point collapsed the existence of a cause of action under the ATA with the applicability of an exception to foreign sovereign immunity under the FSIA. The latter does indeed require that the specific act of international terrorism occur within the United States—as it did here. *See* 28 U.S.C. § 1605B(b)(1). But the material support statute, which is the basis for Count Four of appellants' complaint, *see* App. 117a–21a, is expressly extraterritorial. *See* 18 U.S.C. § 2339B(d)(2). Thus, the material support that forms the basis for the Kingdom's (alleged) liability under Count Four can take place anywhere in the world so long as plaintiffs seeking to impose that liability were injured by **an** act of international terrorism inside the United States that was **caused by** the unlawful material support.

*Terrorism-Support Laws and the Demands of Prevention*, 42 HARV. J.

ON LEGIS. 1, 4–21 (2005).

Here, there is no dispute that the Kingdom knew AQAP was a

designated foreign terrorist organization. As for the Kingdom's

relationship with AQAP, the complaint includes dozens of paragraphs of

specific, fact-based allegations that give rise to at least a reasonable

inference that the Kingdom knew it was providing material support to

AQAP, including that:

- "AQAP and Saudi Arabia are currently fighting side-by-side in the Yemen war against the Houthis movement. Saudi Arabia has provided AQAP with significant resources in connection with the Yemen civil war including weapons and military equipment as well as intelligence and financial support." App. 45a;

- "In Yemen, AQAP pays its fighters with Saudi riyals due to the support it receives from Saudi Arabia. AQAP often pays fighters better and more consistently than pro-government forces, prompting defections and allowing it to grow in strength." *Id*. at 49a;

- "An increase in numbers of Saudi AQAP members after 2010 greatly improved the group's ability to fundraise through donations from Saudi Arabia, and Saudi Arabia allows AQAP financiers to work unencumbered throughout its territory." *Id*.;

- "Saudi Arabia has repeatedly failed to prosecute individuals in its country who are raising money on behalf of AQAP. Indeed, individuals have appeared on Saudi state television and met with Saudi Arabia's grand mufti after being sanctioned by the United States. For example, in 2015, a state-run television network featured Abdulwahhab al-Humayqani. At the time, al-Humayqani had been sanctioned for terrorist financing and was a senior leader within AQAP. His appearance on a state-run network, was a tacit endorsement of AQAP and its supporters by the Saudi government." *Id.* at 50a; and

- "In August 2018, an investigation by The Associated Press cited evidence that the Saudi-led coalition has cooperated with AQAP members in Yemen—recruiting hundreds of fighters, paying others to leave specific cities, and neglecting to confiscate their weapons or stolen cash. According to interviews with Yemeni officials, tribal leaders, and AQAP members, some forces from the Saudi-led coalition recruit current and former members of the terrorist organization because they are skilled fighters. AQAP members claimed that the terrorist group is allied with two of the four central commanders of the Saudi-led coalition on the Red Sea coast, and The Associated Press has identified the al-Qaeda logo on weapons utilized by coalition fighters during a campaign in 2017." *Id.* at 50a–51a.

The district court, after invoking the wrong legal test, simply waved its hands at these allegations—dismissing the ones it even bothered to discuss as "conclusory." *See id.* at 273a n.26. But even after *Iqbal* v. *Ashcroft*, 556 U.S. 662 (2009), this Court has required much

more. When considering a motion to dismiss, courts should "(1) eliminate any allegations in the complaint that are merely legal conclusions; and (2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Am. Dental Ass'n* v. *Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quotations omitted). In other words, **unless** an allegation contains "[l]egal conclusions without adequate factual support" or "[f]ormulaic recitations of the elements of a claim," *Mamani* v. *Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011), it is entitled to a presumption of veracity.

Here, the complaint, including but not limited to the allegations recounted above, offers significant and sustained **non-conclusory** factual support for its claim that the Kingdom knowingly provided (and provides) material support to AQAP. Indeed, the allegations cite to numerous specific examples of the support it alleges the Kingdom provided—including but not limited to its provision of weapons and other matériel to those fighting in Yemen. The Kingdom may dispute whether the allegations are **accurate**, but that is a factual challenge, not a legal one. And "[w]hile there may be a dispute as to whether the

alleged facts are the actual facts, in reviewing the grant of a motion to dismiss, [this Court is] required to accept the allegations in the complaint as true." *St. George* v. *Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002).

Because the district court wrongly held that most of appellants' allegations with respect to the Kingdom's material support to AQAP were "conclusory," it also mis-analyzed whether that support caused appellants' injuries—as required under § 1605B(d)—by focusing only on the handful of allegations it deemed "nonconclusory." *See* App. 277a–80a. Taking the complaint as a whole, it is not even a close question whether there is "some reasonable connection" between the Kingdom's alleged material support to AQAP and the December 6 attack. *See Terrorist Attacks*, 298 F. Supp. 3d at 645 (citing *Owens* v. *Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017)). Insofar as the complaint plausibly alleges that the Kingdom knew that AQAP was a foreign terrorist organization intent on committing acts of international terrorism against the United States, it was reasonably foreseeable that the Kingdom's knowing provision of material support to that organization would facilitate terrorist attacks injuring U.S. persons.

Perhaps recognizing the obviousness of this point, the district court concluded that, "[e]ven if the allegations were sufficient to show material support, Saudi Arabia has denied those allegations, and Plaintiffs have failed to produce evidence in support or to show a specific or targeted allegation that could be proven with limited jurisdictional discovery." App. 278a n.30. But it is axiomatic that the Kingdom's denial of the amended complaint's allegations does nothing to establish their **legal** insufficiency, since courts reviewing a motion to dismiss are limited "to the four corners of the complaint." *Keating* v. *City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). The production of evidence to support the allegations in appellants' complaint is what should happen on remand—not what was required to happen at the pleading stage.

To be sure, the district court's analysis of appellants' JASTA claims is hardly a model of clarity—and not only fails to treat appellants' distinct claims separately, but conflates the scope of the causes of action appellants have pleaded under the ATA with the scope of the exception to foreign sovereign immunity provided by JASTA. In the aggregate, though, what is clear is that this is the **precise** type of

case for which Congress enacted JASTA—where an act of international terrorism on U.S. soil can plausibly be traced, directly **and** indirectly, to the allegedly tortious conduct of a foreign sovereign and its officers and agents. If the allegations in appellants' complaint are insufficient to survive a motion to dismiss with respect to JASTA's exception to foreign sovereign immunity, it is difficult—if not impossible—to imagine allegations that would fare any better.

The district court therefore erred in its dismissal of Count One through Seven, Count Fourteen, and Count Sixteen.

### III.   THE DISTRICT COURT ERRED IN DENYING JURISDICTIONAL DISCOVERY

For the reasons set forth above, the district court's grant of the Kingdom's motion to dismiss should be reversed as a matter of law. But at a minimum, appellants are at the very least entitled to the jurisdictional discovery they properly sought in the district court—so they can have the opportunity to both further substantiate the very connections between the Kingdom and the December 6 attack with respect to which the district court wrongly held the complaint to be facially insufficient, and to litigate their (unaddressed) claim for breach of contract.

As this Court explained in *Butler*, a district court considering whether to permit jurisdictional discovery in FSIA suits must "balance the need for 'discovery to substantiate exceptions to statutory foreign sovereign immunity' against the need to 'protect[] a sovereign's or sovereign agency's legitimate claim to immunity from discovery." 579 F.3d at 1314 (alteration in original; citation omitted). Applying that test, *Butler* held that jurisdictional discovery was unwarranted when "we are unable to see what specific facts additional discovery might reveal that would be crucial to the court's immunity determination." *Id*. On the flip side, where plaintiffs **have** identified specific facts that would be crucial to the court's immunity determination, that balance tips in favor of discovery. *See, e.g.*, *Arch Trading Corp.* v. *Republic of Ecuador*, 839 F.3d 193, 206–07 (2d Cir. 2016) ("[A] district court may deny jurisdictional discovery demands made on a foreign sovereign if the party seeking discovery cannot articulate a 'reasonable basis' for the court first to assume jurisdiction." (citation omitted)).

In their request for jurisdictional discovery, appellants articulated reasonable bases for limited jurisdictional discovery related to three specific topics:

1. Exactly what the Kingdom knew about Al-Shamrani, the CLO, and the other trainees at NAS Pensacola between when they were recruited into the RSAF and vetted for participation in the training program up to (and through) the December 6 attack;

2. The specific information that the Kingdom provided to the FBI and the Navy as part of their investigations into the attack (the FBI investigation remains ongoing, *see* App. 320a); and

3. The nature of the Kingdom's contractual relationship with the United States relating to the training program—including the contract itself.

*See id*. at 302a–07a. These three topics are directly relevant to the two

FSIA exceptions discussed in detail above. Among other things, the

extent to which each of the torts pleaded in appellants' complaint

"occurr[ed] in the United States" could depend on exactly **where**

particular actions were taken (or were supposed to be taken) by the

Kingdom, its officers, and agents. Likewise, whether the Kingdom's

officers and agents had **any** discretion with respect to the duties the

complaint plausibly alleges to be mandatory would also bear directly on

the applicability of the non-commercial tort exception. And the

Kingdom's responses to the FBI and Navy investigations would, quite

obviously, go a long way toward proving or disproving appellants'

allegations about the Kingdom's knowledge, in advance, of Al-

Shamrani's radicalization and extreme, anti-American views.

In addition, the actual contract between the Kingdom and the United States ought to be probative of appellants' claim that it was breached—especially in light of the Kingdom's (uncontested) representations to both then-President Trump and Rep. Gaetz concerning compensation for the victims and their families. *See ante* at 16–17. At the very least, the complaint clearly provided at least a "reasonable basis" (indeed, far more than that) to believe that these additional facts "would be crucial to the immunity determination." *Butler*, 579 F.3d at 1314.

The district court rejected appellants' request in its entirety, but only analyzed the specific request for discovery of the contract— concluding that "Plaintiffs are seeking discovery based only on speculation." App. 291a. It is certainly "speculative" whether the terms of the contract include an **express** waiver of the Kingdom's sovereign immunity (although such a waiver would obviously have rather significant jurisdictional implications). What is not speculative is that the contract is **relevant** to appellants' claims more generally— including the specific representations and commitments the Kingdom made with respect to the vetting, training, and supervision of those

participating in the flight training program; and, perhaps most significantly, with respect to appellants' claim for breach of contract—which the district court never discussed.

With regard to appellants' **other** requests for jurisdictional discovery, the district court "summarily denie[d]" appellants' objections to the magistrate judge's R&R. App. 291a n.37. But insofar as appellants have plausibly alleged that both the non-commercial tort exception and JASTA negate the Kingdom's sovereign immunity from most—if not all—of the causes of action pleaded in the complaint, the jurisdictional discovery they seek would go a long way toward providing accurate answers to the questions the district court **should** have asked below—rather than the conclusory, incomplete, and profoundly inaccurate analyses that were provided instead.

Ultimately, appellants do not believe that jurisdictional discovery is necessary for any of their claims besides Count Nineteen (breach of contract)—and that the Kingdom's motion to dismiss should otherwise have been denied and the case allowed to proceed to the taking of evidence. But at the very least, **before** dismissing this suit in its entirety, including causes of action that it never even addressed, the

district court should at least have given appellants a chance to obtain limited information from the Kingdom that would go a long way toward resolving, one way or the other, each of its claims of immunity.

## CONCLUSION

The district court's confused and confusing analyses might leave the wrong impression about the nature of appellants' claims. Although there are numerous plaintiffs and numerous distinct causes of action, at bottom, this is a relatively straightforward foreign sovereign immunity case arising out of a horrific but relatively straightforward act of international terrorism. An officer of the Royal Saudi Air Force, while in uniform and on duty on U.S. soil, committed an act of international terrorism that resulted in the deaths of three U.S. servicemembers and serious injuries to 13 other servicemembers and civilians.

Appellants have plausibly alleged not only that the Kingdom is liable for the December 6 attack itself, and that the Kingdom's officers and agents breached an array of duties that contributed directly to those wrongful deaths and injuries, but that the Kingdom knowingly **supported** both the terrorist himself and the foreign terrorist organization that claimed responsibility for his attack. Appellants bear

the burden of providing evidence to substantiate their well-pleaded allegations. But to not allow them to have that opportunity in the face of the existing public record is to defeat Congress's specific intent in enacting JASTA in 2016—and the broader purposes of the FSIA itself.

The district court's grant of the Kingdom's motion to dismiss should therefore be reversed. But at the very least, the district court's fundamentally flawed ruling should be vacated so that appellants can pursue the limited jurisdictional discovery that they timely sought below—at which point the Kingdom's motion to dismiss could be analyzed the way it should have been in the first place.

Respectfully submitted,

**Christopher G. Paulos**
Levin, Papantonio, Proctor, Buchanan,
 O'Brien, Barr & Mougey, P.A.
316 South Baylen St., Ste. 600
Pensacola, FL  32502

**Jeffrey E. McFadden**
Law Offices of Jeffrey E. McFadden, LLC
312 Prospect Bay Drive East
Grasonville, MD  21638

**Stephen I. Vladeck**
 *Counsel of Record*
600 New Jersey Ave., N.W.
Washington, DC  20001
(202) 662-9313
svladeck@gmail.com

**Matthew S. Mokwa**
The Maher Law Firm, P.A.
398 W. Morse Blvd., Ste. 200
Winter Park, FL  32789

*Counsel for Plaintiffs-Appellants*

July 25, 2024

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(B) and 32(g)(1), I hereby certify that this brief contains 12,971 words, as calculated by the word count function in Microsoft Word, and excluding the items that may be excluded under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief uses a proportionally spaced typeface, Century Schoolbook, with 14-point typeface, in compliance with Federal Rules of Appellate Procedure 32(a)(5)(A) and 32(a)(6).

Stephen I. Vladeck
Counsel for Plaintiffs-Appellants

July 25, 2024