No. 24-11310

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

BENJAMIN WATSON, JR., et al.,

*Plaintiffs-Appellants*,

v.

KINGDOM OF SAUDI ARABIA,

*Defendant-Appellee*.

_____

On Appeal from the U.S. District Court
for the Northern District of Florida (Pensacola), No. 3:21-cv-329-MCR-ZCB
The Honorable M. Casey Rodgers

_____

## BRIEF FOR APPELLEE

_____

Michael K. Kellogg
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com
*Counsel for Appellee*
*Kingdom of Saudi Arabia*

September 25, 2024

*Benjamin Watson, Jr., et al. v. Kingdom of Saudi Arabia*
No. 24-11310

## APPELLEE'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Local Rule 26.1-1, Appellee provides the following Certificate of Interested Persons and Corporate Disclosure Statement:

**<u>Interested Persons</u>**

The following is a list of trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, and other identifiable legal entities related to a party.

Blackwell, Carly

Blackwell, Ryan

Bolitho, Honorable Zachary C.

Bortner, Thomas C.

Brady, Evelyn

Brady, John Robert

Brodsky Fotiu-Wojtowicz PLLC

Brodsky, Benjamin H.

Cash, III, William F.

Cook, Louie Jefferson

DC Legal Advisory Group, PLLC

*Benjamin Watson, Jr., et al. v. Kingdom of Saudi Arabia*
No. 24-11310

Dorris, Daniel Vernon

Elliott Law Firm PA

Elliott, Kris

Glass, Jonathan

Glass, Joy

Haitham, Sameth

Haitham, Shadin

Harris, David E.

Hogue, Charles

Housam, Matthew

Hoyland, Michael

Johnson, George

Keebler, Krystena

Keebler, Matthew

Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.

Kellogg, Michael K.

Kingdom of Saudi Arabia

Kreindler & Kreindler LLP

Kreindler, James P.

Lawrence, Jr., Irvin

*Benjamin Watson, Jr., et al. v. Kingdom of Saudi Arabia*
No. 24-11310

Lehmer, Kristy

Levin, Papantonio, Proctor, Buchanan, O'Brien, Barr & Mougey, P.A.

LNW a minor child

Lopez, Grant

Lopez, Heather

Maher, Michael C.

Maloney, III, Andrew J.

McFadden, Jeffrey E.

Melton, II, R. Frank

Mokwa, Matthew S.

Newsome Melton, P.A.

Paulos, Christopher G.

Pickett, Curtis

Pickett, Jessica

Rapawy, Gregory G.

Rodgers, Honorable M. Casey

Rose, Daniel O.

Schechinger, Caroline A.

Shen, Andrew C.

Sico Hoelscher Harris LLP

*Benjamin Watson, Jr., et al. v. Kingdom of Saudi Arabia*
No. 24-11310

SLW a minor child

SSH a minor child

SSH II a minor child

Stern, Jesse

The Law Offices of Jeffrey E. McFadden, LLC

The Maher Law Firm, P.A.

Thomas, Breanna

Tinch, Jessica

Tinch, Matthew

Vladeck, Stephen I.

Walters, Amanda

Walters, Dustin

Walters, Mason

Walters, Shane

Watson, Jr., Benjamin

Watson, Sheila Wilemon

## **Corporate Disclosure**

Appellee is not a corporation.

## STATEMENT REGARDING ORAL ARGUMENT

Appellee requests oral argument on this appeal.  This is a case against a foreign state that is a longstanding ally of the United States, accusing it of responsibility for a terrorist attack on U.S. service members.  Jurisdiction depends on the construction and application of the Foreign Sovereign Immunities Act of 1976, a statute that is important to the foreign relations of the United States.  Given the complexity and significance of the issues at stake, oral argument will likely be helpful to the Court.

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................................C-4

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ....................................................................................1

STATEMENT OF THE ISSUES....................................................................2

STATEMENT OF THE CASE ......................................................................2

I.    Factual Background ......................................................................2

II.   Procedural History ........................................................................6

      A.   Appellants' Amended Complaint..........................................6

      B.   Saudi Arabia's and Appellants' Cross-Motions....................7

      C.   The Magistrate Judge's Report and Recommendation ........8

           1.   The JASTA Exception ................................................9

           2.   The Non-Commercial-Tort Exception......................11

           3.   The Waiver Exception ..............................................13

           4.   Jurisdictional Discovery...........................................14

      D.   The District Court's Opinion.............................................15

           1.   The JASTA Exception ..............................................16

           2.   The Non-Commercial-Tort Exception......................17

           3.   The Waiver Exception ..............................................18

           4.   Jurisdictional Discovery...........................................18

SUMMARY OF ARGUMENT ............................................................. 19

STANDARD OF REVIEW .................................................................. 21

ARGUMENT ....................................................................................... 22

I.    The District Court Correctly Concluded That Appellants Fail to
      Satisfy the Non-Commercial-Tort Exception ................................. 24

      A.    Appellants Fail To Satisfy the Non-Commercial-Tort
            Exception Based on the CLO's Alleged Failure To
            Supervise Al Shamrani ......................................................... 24

            1.    Employee Supervision and Training Is a
                  Discretionary Function Immune from Suit ................. 25

            2.    Appellants Have Not Pleaded an Entire Tort in the
                  United States Based on the CLO's Alleged
                  Negligence .................................................................. 30

      B.    Appellants' Additional Arguments Are Forfeited and
            Lack Merit ........................................................................... 31

            1.    Al Shamrani's Intentional Torts Were Not Within
                  the Scope of His Employment .................................... 32

            2.    Appellants' Negligent Vetting, Screening, and
                  Monitoring Theories Are Barred by the
                  Discretionary-Function Exclusion and the Entire-
                  Tort Rule .................................................................... 33

II.   The District Court Correctly Concluded That Appellants Fail
      To Satisfy the JASTA Terrorist-Act Exception ............................. 36

      A.    Appellants Fail To Satisfy the JASTA Terrorist-Act
            Exception Based on Alleged Material Support for
            Terrorism .............................................................................. 36

            1.    Appellants Fail To Plead That Saudi Arabia
                  Supported Al Qaeda .................................................... 37

            2.    Appellants Fail To Plead Causation of the
                  Pensacola Attack ........................................................ 42

3.    Appellants Fail To Plead That Saudi Arabia Knew Al Shamrani Was a Terrorist ...................................................44

B.    Appellants' Mischaracterizations of the District Court's Order Do Not Show Error ...................................................46

III.    The District Court Acted Within Its Discretion in Denying Jurisdictional Discovery ..................................................49

CONCLUSION ........................................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

Page

## CASES

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242
(11th Cir. 2005) ................................................................46

*Andrews v. United States*, 121 F.3d 1430 (11th Cir. 1997)....................................25

*Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193
(2d Cir. 2016)................................................................49, 53

*Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*,
788 F.3d 1329 (11th Cir. 2015) ......................................23

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428
(1989)................................................................25

*Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528 (5th Cir. 1992)........................49

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................38, 41, 45

*Asociacion de Empleados del Area Canalera (ASEDAC) v. Panama
Canal Comm'n*, 453 F.3d 1309 (11th Cir. 2006) ...................................47-48

*Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517
(D.C. Cir. 1984) ................................................................25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................................41

*Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582
(9th Cir. 2020) ................................................................23, 24, 29, 31, 35

*Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207
(D.C. Cir. 1997) ................................................................26

*Burrage v. United States*, 571 U.S. 204 (2014) ......................................42

*Butler v. Sukhoi Co.*, 579 F.3d 1307 (11th Cir. 2009).............. 14, 15, 21, 49, 51, 52

---

[*] Authorities upon which Appellee primarily relies are marked with an asterisk.

v

*Cabiri v. Government of Ghana*, 165 F.3d 193 (2d Cir. 1999) ...............................25

*Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285
(11th Cir. 2005) .......................................................................13

*Carlyle v. United States Dep't of Army*, 674 F.2d 554 (6th Cir. 1982).............26, 29

*CFTC v. Southern Tr. Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018) ....................42

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)................................45

*Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291
(3d Cir. 1994)...........................................................................30

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009).........................26, 33, 34

*Durr v. Secretary of Dep't of Veterans Affs.*, 2022 WL 2315086
(11th Cir. June 28, 2022) ...........................................................48

*Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524 (11th Cir. 1988) ....................50

*Federal Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270
(3d Cir. 1993)...........................................................................52

*First City, Texas–Houston, N.A. v. Rafidain Bank*, 150 F.3d 172
(2d Cir. 1998)...........................................................................14

*Foster Logging, Inc. v. United States*, 973 F.3d 1152 (11th Cir. 2020)......12, 26, 35

*Glickman v. United States*, 626 F. Supp. 171 (S.D.N.Y. 1985) .............................29

*Harper v. United States*, 2020 WL 4192540 (D.D.C. July 21, 2020) ....................27

*Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186
(11th Cir. 2018) ..........................................................................3

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995)......................................................................42

*Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841 (5th Cir. 2000) ...............50

*Ledford v. Peeples*, 657 F.3d 1222 (11th Cir. 2011) ........................................ 22-23

*Luke v. Gulley*, 975 F.3d 1140 (11th Cir. 2020).......................................3

*Mamani v. Berzain*, 654 F.3d 1148 (11th Cir. 2011)................................................44

\*O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009) ...........................................12, 25

*Ochran v. United States*, 117 F.3d 495 (11th Cir. 1997)....................................28, 29

*Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254 (11th Cir. 2015) .......................50

*Sequeira v. Republic of Nicaragua*, 815 F. App'x 345 (11th Cir. 2020) ..........15, 49

*Smith v. United States*, 873 F.3d 1348 (11th Cir. 2017).........................................10

*Spencer v. Assurance Co. of Am.*, 39 F.3d 1146 (11th Cir. 1994).......................9, 33

*Swafford v. United States*, 839 F.3d 1365 (11th Cir. 2016) ...................................28

\*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ............................................25, 33

*Terrorist Attacks on September 11, 2001, In re*:

    \*714 F.3d 109 (2d Cir. 2013) ...........................................................12, 25, 30

    298 F. Supp. 3d 631 (S.D.N.Y. 2018) ...................................................17, 43

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ................................................47, 48

*United States v. Gaubert*, 499 U.S. 315 (1991) .......................................................29

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) ..........................22

*Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686 (D.C. Cir. 2022) ...............13

**STATUTES AND RULES**

Anti-Terrorism Act, 18 U.S.C. §§ 2333-2339D ....................................................36

    18 U.S.C. § 2339A ........................................................................................39

    18 U.S.C. § 2339B ........................................................................................39

    18 U.S.C. § 2339C ........................................................................................39

Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* ....................................12, 25, 27

    28 U.S.C. § 2680(a) ................................................................................25

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583,
    90 Stat. 2891 (codified at 28 U.S.C. §§ 1330, 1332(a), 1391(f),
    1602-1611)..........................................................................1, 7, 12, 19, 21, 22,
                            23, 25, 49, 51, 52, 53

    28 U.S.C. § 1604.....................................................................................23

    28 U.S.C. § 1605.....................................................................................23

    28 U.S.C. § 1605(a)(1)..........................................................................7, 13

    28 U.S.C. § 1605(a)(2)..........................................................................7, 52

    28 U.S.C. § 1605(a)(5)......................................................................7, 11, 24

    28 U.S.C. § 1605(a)(5)(A)..........................................................11, 12, 25, 29

    28 U.S.C. § 1605(a)(5)(B) .......................................................................35

    28 U.S.C. § 1605A..................................................................................23

    28 U.S.C. § 1607.....................................................................................23

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
    130 Stat. 852 (2016) .....................................................................7, 9, 11, 16,
                             20, 21, 32, 36, 37,
                             38, 39, 42, 47, 48, 49

    § 3(a), 130 Stat. 853 ................................................................................7

    28 U.S.C. § 1605B ............................................................................7, 23, 48

    28 U.S.C. § 1605B(b) .......................................................................9, 42, 44

    28 U.S.C. § 1605B(b)(1)..........................................................................21

    28 U.S.C. § 1605B(b)(2).................................................9, 21, 36, 38, 39, 42

    28 U.S.C. § 1605B(d) ................................................ 9, 10, 21, 36, 37, 39, 48

Fed. R. Civ. P.:

    Rule 12(b)(6) ........................................................................22, 46

    Rule 72...................................................................................20, 47

11th Cir. R. 3-1 ...............................................................................32

## ADMINISTRATIVE MATERIALS

Attorney General Barr and FBI Deputy Director Bowdich Hold Press
    Conference at 10:20-11:25 (Jan. 13, 2020),
    https://www.youtube.com/watch?v=sXI5qUsPjEY ......................................53

U.S. Dep't of State:

    Bur. of Near Eastern Affairs, *U.S. Relations With Saudi Arabia:*
    *Bilateral Relations Fact Sheet* (Nov. 1, 2023),
    https://www.state.gov/u-s-relations-with-saudi-arabia/ ................................37

    Bur. of Political-Military Affairs, *U.S. Security Cooperation*
    *With Saudi Arabia* (Jan. 20, 2021), https://www.state.gov/u-s-
    security-cooperation-with-saudi-arabia/......................................................27

    *Terrorist Designation of the Houthis* (Jan. 17, 2024),
    https://www.state.gov/terrorist-designation-of-the-houthis/ ........................39

## OTHER MATERIALS

*Black's Law Dictionary* (8th ed. 2004)...................................................................14

Brian Michael Jenkins, *Stray Dogs and Virtual Armies – Radicalization*
    *and Recruitment to Jihadist Terrorism in the United States*
    *Since 9/11*, RAND (2011), *available at*
    https://www.rand.org/pubs/occasional_papers/OP343.html .................. 40-41

Seth G. Jones, *Re-Examining the Al Qa'ida Threat to the United States*, Testimony presented before the House Foreign Affairs Committee, Subcommittee on Terrorism, Nonproliferation, and Trade on July 18, 2013, *available at* https://www.rand.org/pubs/testimonies/CT396-1.html ................................41

Tim Lister, *WikiLeaks cables assess terrorism funding in Saudi Arabia, Gulf states*, CNN, Dec. 6, 2010 .........................................................41

Fareed Zakaria, *How Saudi Arabia Played Donald Trump*, Wash. Post May 25, 2017 ...................................................................................................41

## INTRODUCTION

This case arises from Mohammed Saeed Al Shamrani's rogue attack on Naval Air Station Pensacola, while stationed there to receive military training as a member of the Royal Saudi Air Force ("RSAF"). Al Shamrani's attack was a terrible crime and a betrayal of his country. Appellee Kingdom of Saudi Arabia ("Saudi Arabia") immediately denounced the attack and cooperated fully with the United States' investigation of it. Saudi Arabia cannot be held liable for Al Shamrani's actions. It is immune from the jurisdiction of the courts of the United States under the Foreign Sovereign Immunities Act of 1976 ("FSIA").

Appellants, who are victims and survivors of victims of the attack, sought redress through an impassioned but legally inadequate complaint. That complaint is full of conclusory accusations that Saudi Arabia has committed all manner of misconduct – from knowing of Al Shamrani's plans, to negligently retaining and supervising him, to being in league with Al Qaeda in Yemen. The magistrate judge methodically reviewed Appellants' allegations and correctly determined that none meets the statutory requirements for jurisdiction over a foreign state. The district court reached the same result after a detailed *de novo* review. Both also properly rejected Appellants' sweeping requests for jurisdictional discovery. This Court should affirm those well-reasoned decisions.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly ruled that Saudi Arabia is immune from suit because Appellants failed to establish a *prima facie* case of any exception to foreign sovereign immunity.

2.    Whether the district court acted within its discretion in denying jurisdictional discovery because Appellants failed to establish a *prima facie* case of any exception to foreign sovereign immunity and because their requests for discovery were overbroad.

## STATEMENT OF THE CASE

### I.    Factual Background

The following facts are set forth as Appellants alleged them in their Amended Complaint.  Although Appellants' well-pleaded allegations should be taken as true for purposes of this appeal, Saudi Arabia does not concede that those allegations are factually accurate or supported by evidence.  In addition, the Amended Complaint refers extensively to investigations conducted by the Navy and by the FBI.  App. 69a, 97a-99a, 102a-103a (¶¶ 173 n.33, 320-321, 324, 327, 341-344).[1]  The Navy's and the FBI's investigative findings are "'referred to in the [Amended] [C]omplaint, central to [Appellants'] claim[s], and of undisputed

---

[1] Citations from App. 1a to App. 675a are to Appellants' Appendix; those from App. 676a to App. 748a are to Appellee's Supplemental Appendix filed with this brief.

authenticity.'" *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020) (quoting *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018)). Accordingly, they were properly before the district court, are properly before this Court, and are recounted below alongside Appellants' allegations.

Mohammed Saeed Al Shamrani joined the RSAF in 2015.  App. 61a (¶ 134). In August 2017, Al Shamrani went to the United States to participate in a training program for foreign allies, like Saudi Arabia, that purchase military equipment from the United States.  App. 32a-33a, 39a (¶¶ 44-46, 67-68).  From August 2017 to May 2018, Al Shamrani received English training in Texas.  App. 39a, 63a (¶¶ 68, 148-149).  In May 2018, he moved to Naval Air Station Pensacola to receive flight training on airplanes Saudi Arabia purchases from the United States. App. 32a, 36a-37a, 63a (¶¶ 43, 58, 149-150).

Appellants allege that, before Al Shamrani entered the United States, Saudi Arabia screened him for security, medical, and character issues.  App. 38a, 61a-62a (¶¶ 64, 135, 143).  The Navy Report states that the United States did so as well. App. 477a-480a.  Appellants allege that Saudi Arabia surveils and monitors its citizens, and from that conclude that Saudi Arabia did or should have discovered through surveillance and monitoring that Al Shamrani had radical views.  App. 52a-59a, 60a-62a (¶¶ 107-125, 131-132, 138).  As the Navy found, however, the Twitter alias that Appellants attribute to Al Shamrani (@M7md_Shamrani)

reflected "his family's lineage within the Shamran tribe, one of the largest in Saudi Arabia," but not his full name – making his account difficult to find.  App. 483a.

In July 2019, Al Shamrani obtained a Florida hunting license and purchased a handgun.  App. 64a (¶ 152).  He carried the handgun while on base, hiding it in his helmet bag.  *Id.* (¶ 155).  Appellants allege in conclusory form that the RSAF employee who supervised Al Shamrani (a Country Liaison Officer, or "CLO"), as well as "other Saudi Arabian trainees," knew Al Shamrani had a gun.  *Id.* (¶ 156).

In September 2019, the RSAF CLO left Pensacola for Saudi Arabia.  App. 64a-65a (¶ 157).  Appellants allege that, after the CLO left, no one supervised Al Shamrani.  *Id.* (¶¶ 157-159).  The Navy found, however, that a Royal Saudi Naval Force ("RSNF") CLO was present "[d]uring absences of the RSAF CLO" and "executed some duties as a joint CLO" for the RSAF and the RSNF.  App. 569a.  The Navy also found that the U.S. military oversaw Al Shamrani during the RSAF CLO's absence.  App. 351a, 354a-355a.

On December 5, 2019, the night before the attack, Appellants allege that Al Shamrani "hosted a dinner party" for fellow RSAF trainees.  App. 66a (¶ 165).  According to Appellants, Al Shamrani discussed his plans for the attack at dinner and had previously disclosed his plans to other trainees while traveling to New York City in November 2019.  App. 65a-66a (¶¶ 162, 164).  The Navy and the FBI determined, however, that no one but Al Shamrani knew his plans.  *See* App. 594a (FBI's finding that there is "no evidence of assistance or pre-knowledge of the

attack by other members of the Saudi military"); App. 351a (Navy's findings that Al Shamrani's "self-radicalization" was "the primary cause of his fatal attack" and that "no one person or organization knew or could have known" about the attack).

On December 6, 2019, Al Shamrani posted an anti-American message on his Twitter account threatening violence, then attacked Naval Air Station Pensacola. App. 71a-72a (¶¶ 187-188). According to Appellants, RSAF trainees who dined with Al Shamrani the night before watched or video-recorded the attack as it unfolded. App. 66a (¶¶ 166-167). The FBI found that was "not . . . accurate." App. 593a. Rather, "[o]ther Saudi cadets happened to be in the area and, after the attack began, they took some videos of the resulting commotion." *Id.*

During his attack, Al Shamrani killed three U.S. service members and injured nine other service members and police officers. App. 71a-77a (¶¶ 187-213). Law enforcement killed him on the scene. App. 77a (¶ 212).

The FBI credited Saudi Arabia with "complete and total support for [its] counter-terrorism investigation." App. 678a. As part of that investigation, the FBI discovered "derogatory material" on other Saudi trainees' phones, including "social media containing some jihadi or anti-American content," but "no evidence of any affiliation or involvement with any terrorist activity or group." *Id.* Saudi Arabia determined that those individuals had engaged in "conduct unbecoming an officer" and recalled them from the United States. *Id.*

5

Appellants allege that Saudi Arabia and the United States reached an "oral contract" after the attacks in which Saudi Arabia "agreed to cooperate fully in the investigation and compensate the victims."  App. 180a (¶¶ 592, 594).  The agreement was allegedly reflected in a comment by then-President Trump stating that Saudi Arabia would "tak[e] care of the families [and] help out the families very greatly."  App. 181a (¶ 596) (alterations in Amended Complaint).

## II.    Procedural History

### A.    Appellants' Amended Complaint

Appellants are the victims of the Pensacola shooting or their survivors. They filed this suit against Saudi Arabia on February 22, 2021.  App. 2a.  Their Amended Complaint advances three overarching theories of liability.  *First*, that Saudi Arabia is vicariously liable for Al Shamrani's attack because the attack was allegedly within Al Shamrani's scope of employment.  *E.g.*, App. 104a-108a (¶¶ 345-362).  *Second*, that Saudi Arabia is liable for failing to prevent the Pensacola attack because it allegedly inadequately screened and supervised Al Shamrani, including because the RSAF CLO left Pensacola before Al Shamrani's attack and Saudi Arabia did not appoint a replacement.  *E.g.*, App. 61a-71a, 150a-162a (¶¶ 135-186, 502-525).  *Third*, that Saudi Arabia is liable because it allegedly gave material support to Al Qaeda.  *E.g.*, App. 42a-52a (¶¶ 78-106).

6

### B.    Saudi Arabia's and Appellants' Cross-Motions

On March 21, 2022, Saudi Arabia moved to dismiss this suit for lack of jurisdiction because it is a foreign sovereign presumptively immune from suit under the FSIA.  App. 5a.[2]  Saudi Arabia argued that Appellants' allegations were both facially (*i.e.*, taken as true) and factually deficient to establish an exception to immunity.  App. 197a.  Appellants opposed, citing four exceptions to immunity: the waiver exception, 28 U.S.C. § 1605(a)(1), the commercial-activity exception, *id.* § 1605(a)(2), the non-commercial-tort exception, *id.* § 1605(a)(5), and the terrorist-act exception created by the Justice Against Sponsors of Terrorism Act, *id.* § 1605B.  App. 197a.[3]

Appellants cross-moved for jurisdictional discovery.  App. 244a.  Their request for jurisdictional discovery included eight broad topics, which they called "'buckets.'"  App. 307a.  The "buckets" consisted of:  (1) Saudi Arabia's alleged "knowledge" of Al-Shamrani's "radicalization," App. 307a-308a; (2) all "information and evidence" from the Navy and FBI investigations, App. 308a-309a; (3) Saudi Arabia's "relationship" with the United States as it pertained to "sales for equipment or training," App. 309a-310a; (4) Saudi Arabia's alleged

---

[2] Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified at 28 U.S.C. §§ 1330, 1332(a), 1391(f), 1602-1611) ("FSIA").

[3] Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 3(a), 130 Stat. 852, 853 (2016) ("JASTA").

"duty to select, investigate, monitor and report . . . candidates" for training, and the "screening and monitoring" of Al Shamrani specifically, App. 311a-312a; (5) Saudi Arabia's alleged "duty to monitor and supervise [those] candidates," and its "compli[ance]" with that alleged duty, App. 312a; (6) all "facts known or knowable by" Saudi Arabia and its employees about Al Shamrani before the attack, App. 312a-313a; (7) the alleged "duties assigned" to Saudi Arabia's "CLO" and his relevant "conduct" and "knowledge," App. 314a-315a; and (8) Al Shamrani's alleged "indoctrination . . . in jihadist and Wahhabist principles," including his "educational background, curricula, religious training and military training" and related "record[s] or communicat[ions]," App. 315a-316a. Saudi Arabia opposed Appellants' motion in its entirety.

### C.    The Magistrate Judge's Report and Recommendation

The district court directed Magistrate Judge Bolitho to prepare a report and recommendation on Saudi Arabia's motion to dismiss, and to issue an order resolving Appellants' motion for jurisdictional discovery. On October 11, 2022, the magistrate judge heard oral argument. On May 11, 2023, he issued a report and recommendation determining that Appellants had failed to plausibly plead or prove that their allegations came within any exception to immunity. He recommended granting the motion to dismiss and denying the motion for jurisdictional discovery. App. 186a-249a.

### 1.    The JASTA Exception

The magistrate judge started with the JASTA exception because Appellants had emphasized that "this is a JASTA case."  App. 197a.  That exception applies to

> any case in which money damages are sought against a foreign state
> for physical injury to person or property or death occurring in the
> United States and caused by—
>> (1) an act of international terrorism in the United States; and
>> (2) a tortious act or acts of the foreign state, or of any official,
>> employee, or agent of that foreign state while acting within the
>> scope of his or her office, employment, or agency . . . .

28 U.S.C. § 1605B(b).  The tortious act on which jurisdiction is based must be an affirmative act (not an "omission") and must be committed with a state of mind that is more than "mere negligence."  *Id.* § 1605B(d).  The magistrate judge found that each of Appellants' liability theories failed to satisfy one or more of the JASTA exception's jurisdictional elements.

*First*, the magistrate judge concluded that Appellants had failed to show that Al Shamrani acted "within the scope of his . . . employment," *id.* § 1605B(b)(2), when he committed his attack.  App. 200a-206a.  Applying Florida law, and emphasizing the "undisputed" fact that "the U.S. is one of Saudi Arabia's most important military allies," the magistrate judge concluded that the attack was not "'the kind'" of conduct he "'was employed to perform'" as a member of Saudi Arabia's air force and was from personal motivations rather than "'to serve [his] employment.'"  App. 201a-202a (quoting *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1150 (11th Cir. 1994)).

9

*Second*, the magistrate judge rejected Appellants' theory that Saudi Arabia was liable for negligently vetting, screening, and supervising Al Shamrani. App. 206a-209a. He found that theory to be "based on omissions" by Saudi Arabia and therefore barred by § 1605B(d). App. 208a-209a. As he explained, Appellants' claims for negligence and gross negligence accused Saudi Arabia and its CLO of "failing to do sixty-one separate things" – each beginning with the phrase "failure to." App. 209a (quoting App. 154a-160a (¶¶ 513-517)). Alternatively, the magistrate judge concluded that the negligence allegations failed for lack of causation because the connection between them and Al Shamrani's attack was too tenuous. App. 214a & n.16.

*Third*, as to Appellants' final theory – that Saudi Arabia had materially supported Al Qaeda – the magistrate judge found that Appellants' allegations were "conclusory" and in any event failed to plead "a proximate causal relationship" to Al Shamrani's attack. *See* App. 211a-220a & n.17 (citing *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017), for the proposition that, even on a facial challenge, "conclusory allegations and legal conclusions" must be disregarded). For example, it cannot reasonably be inferred from allegations regarding Saudi citizens' purported financial support for Al Qaeda that "Saudi Arabia's *government* provided support to [Al Qaeda]." App. 215a-216a (emphasis added). And, in any event, "[c]onnecting any conduct by Saudi Arabia to the [Pensacola] attack requires the stacking of inference, upon inference, upon inference." App. 216a.

## 2.    The Non-Commercial-Tort Exception

The non-commercial-tort exception applies to certain cases

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . .

28 U.S.C. § 1605(a)(5).  It does not apply, however, to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  *Id.* § 1605(a)(5)(A).  As with JASTA, the magistrate judge found that each of Appellants' liability theories failed to satisfy the non-commercial-tort exception's jurisdictional elements.

*First*, the magistrate judge observed that the scope-of-employment analysis under the non-commercial-tort exception is materially identical to the analysis under the JASTA exception, supporting the same conclusion that Al Shamrani's attack was not within the scope of his employment for Saudi Arabia.  App. 221a.[4]

*Second*, the magistrate judge determined that Appellants' other liability theories did not comply with the exception's requirement that an "entire tort"

---

[4] The JASTA exception is somewhat broader because it includes not only officials acting within their scope of office and employees acting within their scope of employment, but also agents acting within their scope of agency.  That difference is not material in this case because Appellants have never contended that Al Shamrani had an agency relationship with Saudi Arabia that was different from his employment relationship.

be committed within the United States.  App. 222a (citing, among other cases,

*In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 116 (2d Cir. 2013)).

That is, Saudi Arabia's alleged failures to check Al Shamrani's background and

to supervise him all relied at least in part on conduct outside the United States.

App. 223a-225a.  The same is true of Saudi Arabia's alleged material support

for Al Qaeda.  App. 224a.

 *Third*, the magistrate judge reasoned that Appellants' negligent screening,

vetting, and supervision theories involve "discretionary functions," which are

carved out from the non-commercial-tort exception by § 1605(a)(5)(A).  App.

225a-233a.  He explained that case law applying both the Federal Tort Claims Act

("FTCA") and the FSIA – which share identical discretionary-function exclusions

from tort liability – uniformly recognizes that "hiring, retaining, and supervising

employees involves an element of judgment and choice."  App. 226a-227a (citing,

*e.g.*, *O'Bryan v. Holy See*, 556 F.3d 361, 384 (6th Cir. 2009)).

 The magistrate judge observed that Appellants failed to point to any policy

or regulation that removed Saudi Arabia's discretion by "'specifically prescrib[ing]

a course of action.'"  App. 228a (quoting *Foster Logging, Inc. v. United States*,

973 F.3d 1152, 1157 (11th Cir. 2020)).  In reaching that conclusion, he analyzed

each of the policies and manuals cited in the Amended Complaint in detail and

concluded that "none . . . imposed a mandatory obligation on Saudi Arabia" and

indeed "were not binding on Saudi Arabia" at all, but rather were "aimed at the U.S. military."  App. 228a-233a.[5]

### 3.    The Waiver Exception

The waiver exception applies where a "foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  The magistrate judge explained that "[e]xplicit waivers must be 'clear[ ] and unambiguous[ ],'" App. 240a (quoting *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022)), and that "the implied waiver provision is 'narrow,'" *id.* (quoting *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005)). He then considered and rejected Appellants' contentions that Saudi Arabia had explicitly waived its immunity through alleged statements agreeing to compensate Appellants or by agreeing to cooperate with the U.S. investigation of Al Shamrani's attacks.  App. 240a-241a.[6]

The magistrate judge also considered and rejected Appellants' allegations that Saudi Arabia "implicitly waived its sovereign immunity by entering into a

---

[5] Because Appellants do not challenge on appeal the district court's ruling that they failed to plead facts supporting application of the commercial-activity exception, we omit from this summary the commercial-activity sections of the magistrate judge's and district court's opinions.

[6] As the magistrate judge explained, the alleged statement by King Salman was that Saudi Arabia "would 'take care of the families' of the victims," but included "nothing about waiving sovereign immunity."  App. 241a.  Similarly, the agreement to cooperate was "not the same thing as explicitly giving up immunity and consenting to be sued for damages."  *Id.*

13

military training agreement with the United States." App. 242a. Appellants had based their allegations on the "Standard Terms and Conditions" for "Letters of Offer and Acceptance" ("LOAs") that the United States uses in military training arrangements with foreign states. App. 243a; *see* App. 670a-675a (copy of publicly available Standard Terms and Conditions). The magistrate judge reviewed the Standard Terms and Conditions and determined that they did not waive immunity because they provided for "consultations" to resolve disputes – meaning, "[i]n the international law context, . . . the 'interactive methods by which states seek to prevent or resolve disputes'" – rather than for litigation. App. 243a & n.24 (quoting *Consultation*, *Black's Law Dictionary* 335 (8th ed. 2004)).

### 4.    Jurisdictional Discovery

The magistrate judge also rejected Appellants' request for jurisdictional discovery. He relied on *Butler v. Sukhoi Co.*, 579 F.3d 1307 (11th Cir. 2009), which instructs "district court[s], when deciding whether or not to allow jurisdictional discovery from a foreign sovereign, to balance the need for 'discovery to substantiate exceptions to statutory foreign sovereign immunity' against the need to 'protect[ ] a sovereign's . . . legitimate claim to immunity from discovery.'" *Id.* at 1314 (quoting *First City, Texas–Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998)) (second alteration in *Butler*), *cited in* App. 245a. He noted *Butler*'s instructions that, "[t]o obtain jurisdictional discovery from a foreign state, a plaintiff must first 'establish a *prima facie* case' that jurisdiction is proper

14

under an exception to the FSIA," App. 246a (quoting 579 F.3d at 1314); and that "'jurisdictional discovery [should be] ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination,'" App. 245a (again quoting *Butler*, 579 F.3d at 1314, and also citing *Sequeira v. Republic of Nicaragua*, 815 F. App'x 345, 352 (11th Cir. 2020) (per curiam)).

The magistrate judge denied discovery for two reasons. *First*, based on his preceding analysis of Appellants' allegations, he concluded that they "ha[d] not established a *prima facie* case that an exception to the FSIA applies." App. 246a. *Second*, he concluded that their request for "broad jurisdictional discovery" was comparable to "the merits discovery that occurs in a normal case" and was not "the type of targeted and circumspect jurisdictional discovery that courts can authorize against a foreign state." *Id.*

## C.    The District Court's Opinion

Appellants objected to the magistrate judge's rulings. App. 710a-748a. Reviewing their objections *de novo*, App. 253a & n.2, the district court agreed with the magistrate judge that, "accepting the nonconclusory allegations in the Amended Complaint as true," Appellants failed to make a *prima facie* case of an exception to immunity and therefore did not clear the bar to obtain jurisdictional discovery, App. 259a-263a. Because the district court concluded that Appellants' allegations fell short on their face, it did not need to (and did not) address Saudi Arabia's factual challenge to them. App. 263a.

15

### 1.    The JASTA Exception

As to Appellants' vicarious-liability theory, the district court, applying the "general rule in Florida that an employee's act of common law battery to accomplish his own purpose is outside the scope of his employment," agreed that Al Shamrani's attack was outside the scope of his employment.  App. 266a-271a. It rejected Appellants' misplaced reliance on a handful of cases finding employers liable for employees' intentional torts because, in those cases, the tort "arose out of or in relation to an actual work-related task, dispute, or exercise of supervisory authority gone awry" – *e.g.*, a security guard shooting an unruly bar patron.  App. 269a-270a & n.22.  By contrast, Al Shamrani's attack was not "grounded in any work-related task or duty of an RSAF member participating in a cooperative training program," nor was he "authorized to possess a weapon."  App. 268a-269a.

As to Appellants' theory of inadequate vetting, screening, and supervision, the district court agreed with the magistrate judge that JASTA's carve-out for omissions barred jurisdiction because Appellants had alleged "failure[s] of the foreign state and/or its agent(s) to do something."  App. 271a-273a.  The court also rejected as "conclusory" Appellants' "allegations that Saudi Arabia knew of Al-Shamrani's affiliation with" Al Qaeda and that "the CLO knew Al-Shamrani had an unauthorized weapon."  App. 273a n.26.

As to Appellants' theory that Saudi Arabia materially supported Al Qaeda, the district court found that "the only nonconclusory allegations are limited to the

conduct of private citizens or mutual efforts [by Saudi Arabia and Al Qaeda] to defeat the Houthis movement in the 'ongoing civil war in Yemen.'" App. 277a (quoting App. 45a (¶ 86)). It found those allegations "too remote and tenuous to demonstrate that Saudi Arabia's actions were a 'substantial factor in the sequence of events' leading to the NAS Pensacola attack or that the attack was 'reasonably foreseeable' to Saudi Arabia based on its activities in connection with Yemen." *Id.* (quoting *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631, 647 (S.D.N.Y. 2018)).

The district court also rejected Appellants' contention that Saudi Arabia was liable for providing material support to Al Shamrani himself. It concluded that "the only support allegedly given to Al-Shamrani was through his job as an RSAF member, and the allegations that Saudi Arabia knew he was an [Al Qaeda] operative because he had expressed extremist views and some citizens were subject to surveillance are both conclusory and speculative." App. 275a (finding "no sufficient factual allegation from which to reasonably infer that Saudi Arabia knew Al-Shamrani was a terrorist intending to attack the United States").

### 2.    The Non-Commercial-Tort Exception

Moving to the non-commercial-tort exception, the district court observed at the outset that Appellants attempted to satisfy the non-commercial-tort exception "based on the CLO's negligence, namely, his failure to follow rules regarding adequate supervision." App. 280a. That observation was correct; although

Appellants had made more general arguments to the magistrate judge, their objections to the part of his Report and Recommendation that dealt with the non-commercial-tort exception focused solely on the CLO.  App. 741a-743a.

Retracing the magistrate judge's "careful[ ]" review of the policies on which Appellants relied, the district court agreed that none imposed mandatory obligations on Saudi Arabia or its CLO, and therefore Appellants' allegations fell within the discretionary-function carve-out.  App. 281a-283a.  The district court also agreed with the magistrate judge that the CLO-related allegations failed the entire-tort rule because they swept in extraterritorial conduct, including the allegation that "the CLO had returned to Saudi Arabia and was no longer present on base."  App. 283a & n.33.

### 3.    The Waiver Exception

The district court observed, correctly, that Appellants did not "specifically object" to the magistrate judge's finding that their allegations did not "support any finding of express or implied waiver of sovereign immunity."  App. 291a; *see* App. 746a (arguing only that the magistrate judge should have granted discovery on this issue, with no challenge to his analysis of their allegations).

### 4.    Jurisdictional Discovery

The district court "summarily denie[d] all objections regarding discovery[,] . . . find[ing] no error, let alone clear error, in the Magistrate Judge's denial of discovery."  App. 291a n.37.  It addressed one specific request that Appellants made

18

for jurisdictional discovery: their request that Saudi Arabia be compelled to produce a copy of its contract with the United States. It rejected that request as "seeking discovery based only on speculation." App. 291a.

## SUMMARY OF ARGUMENT

The district court correctly dismissed Appellants' Amended Complaint for failure to plead a *prima facie* case supporting any exception to sovereign immunity. Contrary to Appellants' assertions, no authority required the court to proceed claim-by-claim, rather than exception-by-exception, in its analysis. Nor would it have made any difference if the court had done so. In whatever sequence they are assessed, Appellants' allegations provide no basis to overcome Saudi Arabia's presumptive immunity from suit.

I.    Appellants failed to plead facts that support jurisdiction under the FSIA's non-commercial-tort exception. The only claim that Appellants have preserved for review under the non-commercial-tort exception is that Saudi Arabia's CLO was negligent in supervising Al Shamrani. That claim fails as a basis for jurisdiction for several reasons. Employee supervision is a discretionary function, and the non-commercial-tort exception does not apply to claims based on the exercise of a discretionary function. The claim also relies on allegations of tortious conduct outside the United States, and therefore falls outside the non-commercial-tort exception under the well-recognized entire-tort rule.

19

Appellants' other claims are forfeited because they were not presented to the district court in Appellants' Rule 72 objections. Review is at most for plain error. The magistrate judge did not plainly err in reasoning that Al Shamrani's intentional torts cannot support jurisdiction because they were not within the scope of his employment. Nor did he plainly err in finding Appellants' negligence claims (other than those targeted at the CLO) to be barred by the discretionary-function exception and the entire-tort rule.

**II.** Appellants also failed to plead facts that support jurisdiction under the JASTA exception for terrorist acts. Their allegations that Saudi Arabia provided material support for Al Qaeda (or that its officials, employees, or agents did so) are conclusory. Their allegations that Saudi citizens have joined or funded Al Qaeda are irrelevant. Their allegations that a Saudi-led coalition in Yemen has made compromises or alliances with Al Qaeda are likewise conclusory and also mischaracterize the sources on which they rely. Further, none of those purported acts of material support plausibly caused Appellants' injuries, even under the generous causation standard that the district court applied. Appellants' claim that Saudi Arabia materially supported Al Shamrani himself fares no better, because it relies on conclusory assertions of knowledge.

In challenging the district court's decision, Appellants repeatedly mischaracterize its reasoning. The court did not, as Appellants suggest, construe

the JASTA exception to require that "an act of international terrorism," 28 U.S.C. § 1605B(b)(1), occur within the actor's scope of employment for a foreign state. Instead, it properly focused on whether the "tortious act or acts," *id.* § 1605B(b)(2), occurred within the scope.  The court also correctly ruled that Appellants' negligent vetting, retention, and supervision claims were based on failures to act and are therefore barred by the carve-out for "omission[s]" in § 1605B(d).  Further, those alleged omissions do not rise to more than "mere negligence."

**III.**    Because Appellants failed to plead a *prima facie* case, the district court properly denied jurisdictional discovery.  In addition, their requests for discovery were overbroad and inconsistent with the requirement that FSIA jurisdictional discovery be limited to verifying specific factual allegations. Instead, Appellants sought sweeping discovery, trying to develop new allegations that would help them plead a case.  Settled authority supports the magistrate judge's and the district court's exercise of discretion to refuse that request.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's conclusion that Appellants' jurisdictional allegations are facially insufficient to overcome Saudi Arabia's presumptive immunity from suit.  *See Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313 (11th Cir. 2009).  It reviews the district court's denial of jurisdictional discovery for an abuse of discretion.  *See id.* at 1314.

21

# ARGUMENT

"At the threshold of every action in a District Court against a foreign state, . . . the court must satisfy itself that one of the exceptions" to immunity set forth in the FSIA "applies." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-94 (1983). The district court correctly concluded that Appellants' allegations are legally insufficient to establish any exception. It applied the familiar Rule 12(b)(6) standard that takes well-pleaded allegations as true, disregards conclusory ones, and permits consideration of materials incorporated by reference into a complaint. Because Appellants failed to plead a *prima facie* case as to any FSIA exception, the district also correctly denied their request for jurisdictional discovery.

Appellants' leading argument (at 24-26), that the district court erred by analyzing Saudi Arabia's immunity "exception-by-exception" rather than "claim-by-claim," is forfeited and wrong. Appellants' own submissions to the magistrate judge and to the district court went exception-by-exception, not claim-by-claim, and nowhere did they argue to the district court that the magistrate judge erred in following that order.[7] *See Ledford v. Peeples*, 657 F.3d 1222, 1258 (11th Cir.

---

[7] *See* Dist. Ct. ECF No. 39, at ii ("I. FSIA's Non-Commercial Tort Exception Applies . . . . II. The JASTA Exception Applies . . . . III. The Commercial-Activity Exception Applies . . . . IV. The Waiver Exception Applies . . . ."); App. 711a (addressing, in order, the magistrate judge's recommendations "to dismiss Plaintiffs' JASTA claims" and then his application of "the noncommercial tort exception," "the commercial activity exception," and the "waiver exception").

2011) ("[E]xcept when we invoke the 'plain error doctrine,' which rarely applies in civil cases, we do not consider arguments raised for the first time on appeal.").

The district court committed no error, much less plain error, in analyzing this case exception-by-exception.  The structure of the FSIA focuses on a list of exceptions:  28 U.S.C. § 1604 states that a foreign state is immune "except as provided in [certain] sections . . . of this chapter," and §§ 1605, 1605A, 1605B, and 1607 describe circumstances to which immunity does not extend.  This Court has proceeded exception-by-exception in an FSIA case featuring multiple claims and multiple exceptions.  *See Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1332, 1338-43 (11th Cir. 2015) (discussing waiver exception and then commercial-activity exception, with no separate discussions of breach-of-contract claim and unjust-enrichment claim).  And, in any event, Appellants do not and cannot point to any meaningful difference that a claim-by-claim analysis would have made.

Appellants quote out of context (at 25) a footnoted parenthetical in *Broidy Capital Management, LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020), saying that "courts must make FSIA immunity determinations on a claim-by-claim basis." *Id.* at 590 n.2 (cleaned up).  In context, *Broidy* was rejecting an argument that "the district court c[ould] assert jurisdiction over th[eir] *entire action* . . . so long as any *one* of their claims fits within an exception in the FSIA." *Id.* (first emphasis

23

added).  That is, *Broidy* merely recognized that plaintiffs must establish an

exception for each claim they bring.  Neither *Broidy* nor the other cases cited

by Appellants (at 24-25) barred the district court from organizing its analysis

exception-by-exception rather than claim-by-claim.

## I.    The District Court Correctly Concluded That Appellants Fail To Satisfy the Non-Commercial-Tort Exception

Appellants failed to plead facts that would bring within the non-commercial-

tort exception their claim that the CLO allegedly failed to supervise Al Shamrani.

As the district court explained, employee supervision is a "discretionary function"

carved out from the exception (and therefore immune), and no law, regulation, or

policy removed the CLO's discretion by mandating particular conduct.  App. 280a-

283a.  The court also correctly determined in the alternative that Appellants do not

plead an entire domestic tort based on the CLO's negligent supervision.  App. 283a

& n.33.  Appellants' other liability theories are forfeited and meritless.

### A.    Appellants Fail To Satisfy the Non-Commercial-Tort Exception Based on the CLO's Alleged Failure To Supervise Al Shamrani

The non-commercial-tort exception applies to claims "for personal injury or

death . . . occurring in the United States and caused by the tortious act or omission

of [a] foreign state or of any official or employee of that foreign state while acting

within the scope of his office or employment."  28 U.S.C. § 1605(a)(5).  An

exception carves out any "discretionary function," meaning that foreign states

24

retain their immunity for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." *Id.* § 1605(a)(5)(A). In addition, the non-commercial-tort exception requires an "'entire tort' . . . committed in the United States," including both "'the injury [and] the tortious acts.'" *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 115-16 (2d Cir. 2013) (quoting *Cabiri v. Government of Ghana*, 165 F.3d 193, 200 & n.3 (2d Cir. 1999)).[8]

### 1. Employee Supervision and Training Is a Discretionary Function Immune from Suit

Cases under both the FSIA and the FTCA[9] recognize that decisions regarding employee supervision and training are discretionary because "(1) these decisions involve an element of judgment and (2) are the type of policy judgments the FSIA discretionary exclusion is designed to shield." App. 281a-282a (citing *Andrews v. United States*, 121 F.3d 1430, 1441 (11th Cir. 1997) ("[C]ourts have

---

[8] *Accord O'Bryan v. Holy See*, 556 F.3d 361, 382 (6th Cir. 2009) (holding that "the 'entire tort' must occur in the United States"); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984) (rejecting jurisdiction because "the entire tort would not have occurred here"); *see generally Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989) ("[T]he exception in § 1605(a)(5) covers only torts occurring within the territorial jurisdiction of the United States.").

[9] The FTCA's discretionary-function provision, 28 U.S.C. § 2680(a), is nearly identical to the FSIA's, *id.* § 1605(a)(5)(A), and so FTCA discretionary-function cases are persuasive authority in FSIA cases. *See*, *e.g.*, *Swarna v. Al-Awadi*, 622 F.3d 123, 145 (2d Cir. 2010).

recognized that decisions regarding the exercise of supervisory authority are of the sort the discretionary function exception was designed to encompass."); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) ("hiring, training, and supervision choices" are decisions "susceptible to policy judgment"); *Carlyle v. United States Dep't of Army*, 674 F.2d 554, 556-57 (6th Cir. 1982) (the manner of supervising army recruits was a "discretionary function")); *see also Doe v. Holy See*, 557 F.3d 1066, 1083-85 (9th Cir. 2009) (per curiam) ("[T]he [FSIA] tortious act exception does not provide jurisdiction over Doe's negligent hiring, supervision, and failure to warn claims because they are barred by the discretionary function exclusion.").

Appellants failed before the district court, and fail again on appeal, to identify a "statute, regulation, or policy" that "specifically prescribes a course of action" for Saudi Arabia or the CLO to take with "no judgment or choice involved." *Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1157-59 (11th Cir. 2020). As the magistrate judge explained, the policies Appellants point to are "aimed at the U.S. military and regulate the conduct of U.S. entities," but "were not binding on Saudi Arabia" and "did not mandate that Saudi Arabia take any specific actions." App. 229a.[10]  The district court properly adopted the magistrate

---

[10] *See* App. 229a-230a (discussing language showing that the Joint Security Cooperation Education and Training Manual "regulates the conduct of the U.S.

judge's "careful[ ] review[ ]" because Appellants did not "argue any particular error in [that] review" and because its own "*de novo* review reveal[ed] nothing to the contrary." App. 282a-283a.

*Harper v. United States*, 2020 WL 4192540 (D.D.C. July 21, 2020), persuasively applied the FTCA's discretionary-function exception to similarly tragic facts. That case arose from a mass shooting by former Army Major Nidal Hasan at Fort Hood in 2009. *Id.* at *1. Hasan, like Al Shamrani, was allegedly influenced by Al Qaeda's ideology when he killed 13 people and injured more than 30 others. *Id.* at *2. Victims of the attack and surviving family members, like Appellants here, alleged that Hasan's military employers "were aware of his extremist views" but failed to "tak[e] precautions . . . or disciplin[e]" him. *Id.* The district court dismissed their claims because the military's "supervision and discipline decisions with respect to" enlisted members "involve judgment and discretion." *Id.* at *5. The same logic has equal force here.

---

military when training international personnel"); App. 230a (same for Security Assistance Management Manual ("Security Management Manual")); App. 230a-231a (same for Flight Student Training Administration Manual ("Flight Student Manual")); App. 232a (same for VT-86 Commanding Officer's Violence Prevention Policy). The magistrate judge further explained that the two other policies Appellants had cited, the NAS-P Personal Firearms Policy and the NAS-P International Military Student Liberty Policy, "may have regulated the conduct of Al-Shamrani" himself, but "did not mandate that Saudi Arabia take any specific actions." App. 229a. Also, to the extent Appellants rely on allegations that the CLO or other trainees knew that Al Shamrani had a gun, App. 64a (¶ 156), those allegations are conclusory and should not be assumed true.

Appellants accuse the district court (at 29) of pitching its analysis at too "high a level of generality," but their brief ignores the magistrate judge's document-by-document analysis of every policy they cited.  As to the CLO in particular, the Navy's Flight Student Manual makes the assignment of a CLO discretionary, not mandatory, stating that "*[a]t the request* of another country" – here, Saudi Arabia – a CLO "*may* be assigned to assist with . . . administrative duties."  App. 652a (emphases added).  Once the CLO was assigned, moreover, Appellants do not and cannot point (at 30-31) to any mandatory duties of the CLO.  To the contrary, the Security Management Manual they cite states that "CLO support and duties will be identified and stated in an agreement between the unit and sponsoring country."  App. 67a (¶ 171), 567a, 628a.  As the Navy explained in its Report, no relevant "formal agreement" between Saudi Arabia and the United States existed at the time of Al Shamrani's attack, and any such agreement would have been "nonbinding."  App. 231a n.22, 568a-569a.

The cases on which Appellants rely (at 30-34) do not help them.  The lack of specific requirements binding Saudi Arabia sets this case apart from *Swafford v. United States*, 839 F.3d 1365 (11th Cir. 2016), which involved a contract with "specific[ ]" requirements "to inspect, maintain, and repair . . . stairways," *id.* at 1372, from *Ochran v. United States*, 117 F.3d 495 (11th Cir. 1997), which involved a policy for prosecutors mandating that information about remedies

against intimidation and harassment "shall routinely be made available to victims and witnesses," *id.* at 500, and from *Glickman v. United States*, 626 F. Supp. 171 (S.D.N.Y. 1985), which held that a government program allegedly testing experimental drugs on "unwary citizens" in mundane places like coffee shops went "beyond any reasonable discretion on the part of a Government agency" because it "seriously violate[d] the constitutional rights of a citizen," *id.* at 174-75.[11]

Alternatively, the district court's judgment is also supported by the Ninth Circuit's holding in *Broidy* that "the policy discretion of a foreign sovereign is . . . evaluated" based on the "limitations that bind *that* sovereign," either in its "own domestic law" or, perhaps, in "applicable and established principles of international law." 982 F.3d at 591 (some emphases omitted). Here, the magistrate judge and the district court assumed that U.S. domestic laws, regulations, or policies could be the source of constraints on discretion, but found that no relevant law, regulation, or policy actually did impose such constraints. Under the rule persuasively set out in *Broidy*, U.S. domestic laws, regulations, and policies are altogether irrelevant to § 1605(a)(5)(A). Appellants have never

---

[11] Appellants misplace reliance (at 31 & n.5) on the Sixth Circuit's 1982 dicta in *Carlyle* stating that, if the Army had voluntarily appointed a supervisor, a "plaintiff might properly claim that the conduct of the on-site supervisor was an operational act subject to review under the FTCA," as opposed to a "planning" decision not subject to review. 674 F.2d at 557. The Supreme Court has since rejected the distinction between planning and operational acts, holding that "[d]iscretionary conduct is not confined to the policy or planning level." *United States v. Gaubert*, 499 U.S. 315, 325-26 (1991).

identified any Saudi or international law that constrains Saudi Arabia's discretion in vetting or supervising its military personnel.

### 2. Appellants Have Not Pleaded an Entire Tort in the United States Based on the CLO's Alleged Negligence

Appellants also fail to plead an "entire tort . . . in the United States," *Terrorist Attacks*, 714 F.3d at 115 (cleaned up), based on the CLO's alleged negligent supervision. The alleged negligent supervision "did not take place entirely within the United States because," as the Amended Complaint alleges, "the CLO had returned to Saudi Arabia and was no longer present on base." App. 283a & n.33; *see* App. 64a-65a (¶ 157). That is, the tortious conduct pleaded includes his failure to return when he was out of the country. Appellants further allege that the CLO's post remained unfilled because Saudi Arabia "failed to fill his absence until January 2020." App. 64a-65a (¶ 157); *see* App. 159a (¶ 515) (similar). There is no allegation that the CLO's supervisors, who allegedly should have taken action to replace him, were ever in the United States at any time. Appellants therefore fail to satisfy the "entire tort" rule.

Appellants' assertion (at 35) that the inquiry should focus on "where [the tortfeasors'] duties required them to be," rather than "on where the tortfeasors actually were," is unsupported by law and irrelevant on the facts. The better view is that a tortious omission occurs at the tortfeasor's location. *Cf. Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 295 (3d Cir. 1994) (for venue

30

purposes, holding that "omissions" such as "failure to return various materials and failure to remit payments" occurred at defendant's location, rather than the place of delivery). In any event, the rule Appellants advocate is irrelevant because they fail to allege that the CLO had a mandatory duty to be in the United States, *supra* pp. 26-27, and do not even try to allege that his supervisors (who they say should have replaced him) ever had duties that required them to be in the United States.

Appellants also misplace reliance (at 36) on the Ninth Circuit's statement that the entire-tort rule is satisfied if "at least one entire tort occur[s] in the United States." *Broidy*, 982 F.3d at 590. Appellants' allegations of negligent supervision include not only the CLO's alleged inaction while in the United States, but also his alleged failure to return to the United States and Saudi Arabia's alleged failure to replace him. *Supra* p. 30. Even their brief in this Court emphasizes their allegations that the CLO was "absen[t]," that "he was not present," that Saudi Arabia did not "provide a replacement," and that "there was no Saudi officer supervising the trainees" in the "weeks leading up to the attack." Appellants' Br. 11-12 (boldface omitted). Without reference to things that allegedly should have been done in Saudi Arabia, Appellants have pleaded no entire tort.

### B.    Appellants' Additional Arguments Are Forfeited and Lack Merit

Appellants also contend (at, *e.g.*, 32, 37-38) that the non-commercial-tort exception conveys jurisdiction over their theories that Saudi Arabia is vicariously

liable for Al Shamrani's intentional torts and for the actions of "numerous Saudi officials" other than the CLO.  Those claims are forfeited because Appellants did not raise them in their objections to the magistrate judge's order, which focused solely on the CLO's purported negligence.  App. 741a-743a.  Appellate review of a magistrate judge's unobjected-to rulings is at most for "plain error."  11th Cir. R. 3-1.  The record shows none.

### 1.    Al Shamrani's Intentional Torts Were Not Within the Scope of His Employment

Al Shamrani's intentional torts are not attributable to Saudi Arabia (jurisdictionally or otherwise) because they were not within the scope of his employment.  As the magistrate judge explained, this analysis is essentially the same for the JASTA and the non-commercial-tort exceptions.  App. 200a-206a, 221a.  The district judge addressed scope of employment in discussing the JASTA exception.  App. 266a-271a.  She did not discuss the point in connection with the non-commercial-tort exception because Appellants had not argued to her that Al Shamrani's intentional torts fit within the non-commercial-tort exception.[12]

---

[12] Appellants mischaracterize the record in asserting (at 22) that the district court reasoned that "appellants' tort claims are all foreclosed" under the "non-commercial tort[]" exception because those claims all "relate to the supervision of employees."  The court instead correctly reasoned that the only non-commercial-tort claim *asserted in Appellants' objections* – the CLO's negligence – related to the supervision of employees.

There was no error, much less plain error, in the district court's analysis of the scope of Al Shamrani's employment. His intentional torts fail to meet two requirements of Florida's scope-of-employment standard: attacking Saudi Arabia's U.S. allies was not "the kind" of conduct he "was employed to perform" as a member of Saudi Arabia's air force, and the attack was from personal motivations and not "to serve [his] employment." *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1150 (11th Cir. 1994).

> **2.** **Appellants' Negligent Vetting, Screening, and Monitoring Theories Are Barred by the Discretionary-Function Exclusion and the Entire-Tort Rule**

Appellants' additional allegations (at 31-32) that Saudi Arabia "fail[ed] to adequately vet" Al Shamrani, "fail[ed] to . . . screen[]" him, or "knew or should have known about [his] growing radicalization" all describe theories of liability that both involve discretionary functions and rest on extraterritorial conduct.

**a.** There was no error, plain or otherwise, in the magistrate judge's unobjected-to conclusion that vetting, screening, and monitoring employees are discretionary functions that involve policy judgment. *See Swarna*, 622 F.3d at 146 ("Swarna's claim that Kuwait failed to institute procedures or a system to monitor its employees implicates a discretionary function."); *Doe*, 557 F.3d at 1084 ("[T]he decision of whether and how to retain and supervise an employee, as well as whether to warn about his dangerous proclivities, are the type of discretionary judgments that the exclusion was designed to protect.").

33

Appellants cannot show plain error with a general assertion that Saudi Arabia had "dozens of mandatory duties imposed . . . by the underlying contract[,] by U.S. laws or regulations[,] and by Saudi laws and regulations."  Appellants' Br. 30 (boldface omitted).  It was Appellants' burden to allege policies that Saudi Arabia's allegedly deficient vetting and screening violated.  *See*, *e.g.*, *Doe*, 557 F.3d at 1084 (observing that the plaintiff in that case failed to "state the terms of [an] alleged policy, or describe any documents, promulgations, or orders embodying it").  The magistrate judge and the district court reviewed each policy Appellants cited and concluded that none imposed mandatory duties on Saudi Arabia.  *Supra* pp. 12-13, 18, 26-27.

None of the purported duties in Appellants' bullet list (at 30-31) is to the contrary.  *First*, Appellants assert (at 30) that Saudi Arabia was "required to conduct a security screening of applicants to the [Security Cooperation Education and Training Program]," but cite no policy, rule, or regulation requiring Saudi Arabia to conduct screening.  Nor do they identify policies, rules, or regulations mandating how such security screening must be conducted, alleging only that Saudi Arabia would be "responsible for implementing host nation screening/vetting protocols." App. 38a (¶ 63); *see also* App. 37a, 62a, 151a-160a (¶¶ 62, 143, 506-518).  They point to nothing that mandates what those protocols had to be.

*Second*, Appellants assert (at 30) that Saudi Arabia was required to truthfully complete "Al-Shamrani's International Travel Order and visa application paperwork," but cite no rule or regulation imposing such a requirement or specifying steps or methods to comply.  Further, any tort claim based on alleged misrepresentations in Al Shamrani's visa application (or in any other document) would not qualify for the non-commercial-tort exception, which excludes claims "arising out of . . . misrepresentation."  28 U.S.C. § 1605(a)(5)(B).

*Third*, Appellants assert (at 30) that Saudi Arabia was required "to comply with U.S. policies and procedures governing access to military bases (including screening for those with ties to terrorism or adherence to extremist ideologies)," but again fail to identify any policy, rule, or regulation requiring such screening or mandating how it should occur.  Whether and how to vet and screen trainees thus remained discretionary policy determinations involving "judgment or choice." *Foster Logging*, 973 F.3d at 1157-58.  The district court also correctly determined that the Navy rules restricting private firearm possession applied to Al Shamrani, not to Saudi Arabia.  *Supra* pp. 26-27 n.10.

In addition, Appellants' arguments also fail for the additional reason that U.S. domestic laws, policies, and regulations do not constrain the policy discretion of a foreign sovereign.  *Supra* pp. 29-30 (discussing *Broidy*).

35

**b.**    Nor was there plain error in the magistrate judge's unobjected-to finding that none of Appellants' various vetting, screening, and monitoring theories stated an entire tort in the United States. Leaving aside the CLO already discussed above, *supra* pp. 30-31, there is no allegation that any Saudi official responsible for vetting, screening, or monitoring Al Shamrani was or should have been in the United States.

## II.    The District Court Correctly Concluded That Appellants Fail To Satisfy the JASTA Terrorist-Act Exception

### A.    Appellants Fail To Satisfy the JASTA Terrorist-Act Exception Based on Alleged Material Support for Terrorism

Unlike the non-commercial-tort exception, JASTA does not require an entire tort within the United States and has no discretionary-function exception. Instead, it has other requirements. As relevant here, Appellants must establish: (1) an "act or acts" of Saudi Arabia, or of "an[] official, employee, or agent" of Saudi Arabia, "acting within the scope of . . . office, employment, or agency," (2) that was "tortious," and (3) that "caused" their injuries. 28 U.S.C. § 1605B(b)(2). JASTA also excludes claims "on the basis of an omission or a tortious act or acts that constitute mere negligence." *Id.* § 1605B(d).

Appellants primarily argue (at 40-58) that JASTA applies to their five claims under the Anti-Terrorism Act, 18 U.S.C. §§ 2333-2339D. Those claims allege that Saudi Arabia directly and indirectly provided material support to Al Qaeda that

caused Al Shamrani's attack.  App. 108a-131a (¶¶ 363-429).  The district court correctly concluded that Appellants' material-support allegations do not satisfy JASTA's exception to immunity because Appellants make no well-pleaded allegations that (1) Saudi Arabia supported Al Qaeda or that (2) any such support caused Al Shamrani's attack.  App. 273a-280a.

### 1.    Appellants Fail To Plead That Saudi Arabia Supported Al Qaeda

Appellants correctly state (at 53) that, to come within the JASTA exception, their material-support allegations must "give rise to at least a reasonable inference that the Kingdom knew it was providing material support to [Al Qaeda]."  But the allegations to which they point do not meet that standard.  That should not be surprising in light of the U.S. government's recognition of Saudi Arabia as a "strong partner in security and counterterrorism efforts."[13]

*First*, many of Appellants' material-support allegations are not well-pleaded, such as their general assertions that "Saudi Arabia has provided [Al Qaeda] with

---

[13] U.S. Dep't of State, Bur. of Near Eastern Affairs, *U.S. Relations With Saudi Arabia: Bilateral Relations Fact Sheet* (Nov. 1, 2023), https://www.state.gov/u-s-relations-with-saudi-arabia/; *see also* U.S. Dep't of State, Bur. of Political-Military Affairs, *U.S. Security Cooperation With Saudi Arabia* (Jan. 20, 2021) ("The United States and Saudi Arabia are working collectively toward the common goal of a stable, secure, and prosperous Middle East. . . .  Supported by U.S. security cooperation efforts, the Kingdom foiled numerous terrorist attempts against Saudi and foreign targets and successfully deterred external attacks."), https://www.state.gov/u-s-security-cooperation-with-saudi-arabia/.

significant resources . . . including weapons and military equipment as well as intelligence and financial support" or gives Al Qaeda "riyals" to "pay[ ] fighters." App. 45a, 49a (¶¶ 86, 98); *see also* App. 42a-43a (¶¶ 78, 81) (Al Qaeda's "funding . . . has been directly traced to Saudi Arabia"; Saudi Arabia has "poured funds and weapons into al-Qaeda"); App. 45a (¶ 87) ("sustained support from Saudi Arabia"); App. 52a (¶ 106) ("material support" from "Saudi Arabian government actors and agents"). Those statements are "no more than conclusions" and are accordingly "not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

*Second*, many of Appellants' material-support allegations are legally insufficient because they refer to Al Qaeda members or donors who are private Saudi citizens, with no role (alleged or otherwise) in Saudi Arabia's government. *See* App. 45a-46a (¶¶ 89-93) ("prominent Saudi Arabian citizens," a "Saudi-born" individual, a "Saudi citizen," a "prominent Saudi," and a "heavy Saudi presence"); App. 49a (¶ 99) ("Saudi . . . members"). Acts by Saudi citizens who are not alleged to be "official[s], employee[s], or agent[s]" of Saudi Arabia, much less acting "within the scope" of any such relationship, 28 U.S.C. § 1605B(b)(2), do not support jurisdiction under the JASTA exception.

Similarly irrelevant are allegations that Saudi Arabia failed to stop its citizens from joining or supporting Al Qaeda. *See*, *e.g.*, App. 49a (¶ 99) ("Saudi

Arabia allows [Al Qaeda] financiers to work unencumbered"); App. 50a (¶ 102)

("Saudi Arabia has repeatedly failed to prosecute" Al Qaeda supporters).  The

material-support statutes on which Appellants rely prohibit "provi[sion]" of

"support," "resources," or "funds" for terrorists or terrorist organizations.  18

U.S.C. §§ 2339A, 2339B, 2339C.  Failure to prevent others from providing

support, resources, or funds does not violate those statutes and therefore is not a

"tortious act."  28 U.S.C. § 1605B(b)(2).  Any failure-to-prevent theory is also

barred by JASTA's exclusion for "omission" claims.  *Id.* § 1605B(d).

    *Third*, Appellants' allegations that Saudi Arabia "fight[s] side-by-side" with

Al Qaeda "in the Yemen war against the Houthis," App. 45a, 50a (¶¶ 86, 103),

also do not support jurisdiction.  As an initial matter, the Court may take notice

that the United States has designated the Houthis as a Specially Designated

Global Terrorist Group and thus Saudi Arabia's opposition to the Houthis only

underscores its alignment with the United States.[14]  Further, the allegations of an

alliance with Al Qaeda either are conclusory, App. 45a (¶ 86), or rely heavily on a

newspaper article that the Amended Complaint mischaracterizes, App. 50a (¶ 103).

---

[14] *See* U.S. Dep't of State, *Terrorist Designation of the Houthis* (Jan. 17, 2024) (explaining that this designation results from the Houthis' "unprecedented attacks against international maritime vessels in the Red Sea and Gulf of Aden, as well as military forces positioned in the area"), https://www.state.gov/terrorist-designation-of-the-houthis/.

That article – titled "US allies, al-Qaida battle rebels in Yemen" – describes "decisive victories" against Al Qaeda in Yemen by "a military coalition led by Saudi Arabia and backed by the United States."  App. 681a.  And it attributes those victories to "compromises and alliances" that the United States itself helped create.  App. 682a (quoting a source stating:  "Elements of the U.S. military are clearly aware that much of what the U.S. is doing in Yemen is aiding [Al Qaeda] . . . .  However, supporting the UAE and the Kingdom of Saudi Arabia against what the U.S. views as Iranian expansionism takes priority over battling [Al Qaeda] . . . .").  To the extent it describes alleged payments to Al Qaeda, it attributes them generally to a "Saudi-led coalition," App. 682a-683a, and does not identify any payment by Saudi Arabia or any Saudi official, employee, or agent.  The only specific payments it purports to describe were made "in the presence of Emiratis," not Saudis.  App. 685a.

The other "media accounts and other public sources" on which Appellants rely (at 47) similarly fail to shore up their material-support allegations.  For example, they point (*id.*) to "congressional testimony" and a "RAND study" that discuss Al Qaeda, but neither says anything about alleged support from Saudi Arabia.[15]  They also point to a newspaper opinion piece that criticizes Saudi

---

[15] *See* Brian Michael Jenkins, *Stray Dogs and Virtual Armies – Radicalization and Recruitment to Jihadist Terrorism in the United States Since 9/11*, RAND

Arabia's state religion and contains an unsupported statement that Saudi Arabia

"is in a tacit alliance with al-Qaeda in Yemen."[16]  "Rule 8," which "does not

unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions," *Iqbal*, 556 U.S. at 678-79, does not make an exception for a plaintiff

quoting conclusory statements from news articles.

In sum, the Amended Complaint's material-support allegations fail to cross

"the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  Alternatively, this Court may also affirm on the ground that,

as the district court observed:

> Even if the allegations were sufficient to show material support, Saudi
> Arabia has denied those allegations, and [Appellants] have failed to
> produce evidence in support or to show a specific or targeted
> allegation that could be proven with limited jurisdictional discovery.

---

(2011), *cited in* App. 49a n.14, *available at* https://www.rand.org/pubs/occasional_
papers/OP343.html; Seth G. Jones, *Re-Examining the Al Qa'ida Threat to the
United States*, Testimony presented before the House Foreign Affairs Committee,
Subcommittee on Terrorism, Nonproliferation, and Trade on July 18, 2013, *cited in*
App. 50a n.15, *available at* https://www.rand.org/pubs/testimonies/CT396-1.html.

[16] Fareed Zakaria, *How Saudi Arabia Played Donald Trump*, Wash. Post
May 25, 2017, *cited in* App. 51a n.16, *reprinted in* App. 692a-693a.  The opinion
piece also refers to a "leaked email" about "'clandestine financial and logical
support'" to "'radical Sunni groups.'"  App. 692a.  Following the hyperlink to find
the quote reveals a 2010 article describing a cable from a U.S. Ambassador stating
that individual "donors in Saudi Arabia" fund extremist groups and that the Saudi
government is "cooperating more actively than at any previous point to respond
to terrorist financing concerns raised by the United States, and to investigate and
detain financial facilitators of concern."  Tim Lister, *WikiLeaks cables assess
terrorism funding in Saudi Arabia, Gulf states*, CNN, Dec. 6, 2010, *reprinted in*
App. 695a-697a.

App. 278a & n.30; *see infra* pp. 49-54 (further discussing jurisdictional discovery). The court thus reasonably declined Appellants' invitation to launch a U.S. judicial investigation into Saudi Arabia's internal prosecutorial decisions or its conduct of hostilities in Yemen.

### 2.    Appellants Fail To Plead Causation of the Pensacola Attack

In addition, Appellants' material-support allegations do not satisfy JASTA's requirement that a plaintiff's injuries be "caused by," 28 U.S.C. § 1605B(b), a foreign state's "tortious act or acts," *id.* § 1605B(b)(2). The best reading of the phrase "caused by" in § 1605B(b) requires a plaintiff to plead and to prove traditional tort causation, which includes both factual (or "but-for") causation and legal (of "proximate") causation. *See Burrage v. United States*, 571 U.S. 204, 213-14 (2014) (construing phrase "results from" to require but-for causation, and discussing similar treatment for phrases "based on," "because of," "results in," and "as a result of"); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995) (construing phrase "caused by" to require proximate causation); *CFTC v. Southern Tr. Metals, Inc.*, 894 F.3d 1313, 1329 (11th Cir. 2018) (discussing the common-law understanding of causation).

The district court accepted Appellants' argument that the JASTA exception does not require but-for causation, but only a less-demanding version of proximate cause. App. 275a-276a. Specifically, it required a "reasonable connection"

between Saudi Arabia's conduct and their injuries through factual allegations showing that "[Saudi Arabia's] conduct was (1) a 'substantial factor in the sequence of events that led to [Plaintiffs'] injury' and (2) that [Plaintiffs'] injury was 'reasonably foreseeable or anticipated as a natural consequence of the [Saudi Arabia's] actions.'"  App. 276a (quoting *In re Terrorist Attacks on September 11, 2001*, 298 F. Supp. 3d 631, 645-46 (S.D.N.Y. 2018)).  That was the standard Appellants themselves had urged that court to apply.  App. 740a (citing the same case).

Even applying Appellants' standard, the district court correctly concluded that the Amended Complaint's allegations were "too remote and tenuous" to establish causation.  App. 276a-277a.  That is, even if Appellants could show some tortious act in Saudi Arabia's alleged failure to prosecute Al Qaeda members or alleged compromises with Al Qaeda fighters in Yemen, they still could not link those allegations to Al Shamrani.  Further, if traditional causation standards are applied (as they should be), Appellants are even less able to show a but-for causal relationship or a direct (rather than attenuated) connection between the allegedly tortious conduct and their injuries.

Appellants err in contending (at 56) that they have pleaded causation because "it was reasonably foreseeable that the Kingdom's knowing provision of material support to [Al Qaeda] would facilitate terrorist attacks injuring U.S.

43

persons." That is, they contend that any alleged material support for terrorism "cause[s]," within the meaning of § 1605B(b), any injury from any terrorist attack committed by the terrorist receiving the support, with no further link to the specific attack required. That is not causation in any sense. Further, Appellants abandon any challenge to the district court's reasoning that they pleaded no facts to show that Saudi Arabia's alleged conduct was a "substantial factor" in causing their injuries. The phrase "substantial factor" appears nowhere in their brief.

### 3. Appellants Fail To Plead That Saudi Arabia Knew Al Shamrani Was a Terrorist

Appellants also press (at 50-51) a theory that Saudi Arabia materially supported Al Qaeda by employing Al Shamrani as a member of its air force and by sending him for training in the United States. A necessary premise of this theory is that Saudi Arabia knew (or, at minimum, recklessly disregarded) that Al Shamrani planned to commit an act of terrorism.[17] The district court correctly rejected the Amended Complaint's "allegations that Saudi Arabia knew [Al Shamrani] was an [Al Qaeda] operative" as "both conclusory and speculative." App. 275a; *see Mamani v. Berzain*, 654 F.3d 1148, 1153-54 (11th Cir. 2011) (holding that "'bare

---

[17] Appellants object (at 50) that in principle material-support liability does not require knowledge of a "specific person who will carry out" a crime or a "specific criminal act." But theory that Saudi Arabia "provided material support *to Al-Shamrani*," *id.* (emphasis added), could be viable only if Saudi Arabia knew Al Shamrani would use the support for a terrorist act.

assertions'" that governmental officials "knew or should have known of wrongful violence taking place and failed in their duty to prevent it" are "'not entitled to be assumed true'") (quoting *Iqbal*, 556 U.S. at 681).

To support their allegations of knowledge, Appellants point (at 9-10) to paragraphs 107 to 125 of their Amended Complaint. The Amended Complaint merely alleges that Saudi Arabia, in general, "surveil[s]," "monitors," and "tracks" its citizens, including those "living outside of Saudi Arabia." App. 52a-54a, 58a-59a (¶¶ 108-109, 112, 124). It collects statements about or examples of alleged surveillance, none involving Al Shamrani. App. 53a-58a (¶¶ 110-111, 113, 115-124). From that, it posits that, "[a]t all times, Saudi Arabia was monitoring Al-Shamrani and was aware of his extremist ties" and "knew exactly where Al-Shamrani and his fellow RSAF officers were." App. 54a, 59a (¶¶ 114, 125). That remarkable logic would charge Saudi Arabia with knowledge of the statements, actions, and whereabouts of all of its citizens at all times.

Allegations that Saudi Arabia has broad surveillance abilities do not support a reasonable inference that Saudi Arabia actually surveilled a particular individual or through surveillance discovered that an individual had extremist or terrorist ties or plans. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (rejecting standing to challenge surveillance because "respondents can only speculate as to how [U.S. officials] will exercise their discretion in determining which

45

communications to target"). Even on a Rule 12(b)(6) motion, "unwarranted deductions of fact are not admitted as true," including deductions of knowledge. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (per curiam) (cleaned up); *see id.* (refusing to accept inference that police knew of torture by private actors merely because "the police station was spacially near" the place where the torture allegedly occurred). Such an inference is especially unreasonable in light of the Navy's finding that Al Shamrani used a Twitter alias that disclosed only his (very common) family lineage, not his personal name. App. 483a.

### B.   Appellants' Mischaracterizations of the District Court's Order Do Not Show Error

Appellants mischaracterize the district court's ruling in several ways, attributing to it rulings it never made and things it never said. *First*, Appellants mischaracterize (at 41, 43-47) the district court's order as "requir[ing] that Al-Shamrani's act of international terrorism occur within the scope of his employment, and not just that the Kingdom's (or its agents') tortious acts so occur." The court imposed no such requirement. To be clear, Appellants did argue that Al Shamrani's attack was an intentional tort within the scope of his employment, App. 727a-734a, and the district court correctly rejected that

argument, *supra* pp. 9-10, 16-17.[18]  But it nowhere suggested that such an analysis disposed of Appellants' other tort claims.  It dealt with those other claims separately and concluded that they failed to meet the JASTA exception for other reasons.  App. 271a-273a (negligent vetting, retention, and supervision claims); App. 273a-280a (material-support claims).

Appellants also mischaracterize (at 48-49) the district court's order as concluding that their material-support claims were based on "omissions."  Again, the court never said that.  Its analysis of the § 1605B(d) carve-out for omissions addressed Appellants' negligent vetting, retention, and supervision claims, not their material-support claims.  App. 271a-273a.  Their material-support claims failed not because they are omission-based, but because they are conclusory and did not show causation.  App. 273a-280a.

Appellants further suggest that JASTA's exclusion for omission-based conduct should not apply here because "'[i]naction can be culpable in the face of some independent duty to act.'"  Appellants' Br. 49 & n.11 (quoting *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489 (2023)).  The argument is forfeited because Appellants have raised it only in a cursory footnote.  *See Asociacion de Empleados del Area Canalera (ASEDAC) v. Panama Canal Comm'n*, 453 F.3d 1309, 1316 n.7

---

[18] Appellants oddly complain that the district court "analyzed the scope of Al-Shamrani's employment in the first place."  Appellants' Br. 43 (boldface omitted).  They spent six pages of their Rule 72 objections arguing that very issue.

(11th Cir. 2006); *Durr v. Secretary of Dep't of Veterans Affs.*, 2022 WL 2315086, at \*3 (11th Cir. June 28, 2022) (per curiam).  Even if preserved, the argument misses the point.  The JASTA exception bars jurisdiction "bas[ed] [on] an omission," 28 U.S.C. § 1605B(d), culpable or otherwise.[19]  The magistrate judge correctly concluded, and the district court agreed, that the term "omission" should receive its ordinary meaning as a "failure to do something."  App. 207a-209a, 271a-273a.  Appellants do not and cannot dispute that their negligent vetting, retention, and supervision claims are based on Saudi Arabia's alleged failure to prevent Al Shamrani's attack.

In addition, even if Appellants' claims based on allegedly negligent vetting, retention, and supervision were not based on omissions, they would still be claims for "mere negligence," which are separately excluded by § 1605B(d).  Appellants argued to the district court that Saudi Arabia's acts were more than merely negligent because Saudi Arabia allegedly knew of Al Shamrani's terrorist sympathies.  As set forth above, *supra* pp. 45-46, those allegations are conclusory and rest on unwarranted inferences.

---

[19] *Taamneh*, from which Appellants quote, does not suggest otherwise.  That case did not interpret § 1605B at all and did not state any principle that omissions are generally actionable.  To the contrary, *Taamneh* explained that "our legal system generally does not impose liability for mere omissions, inactions, or nonfeasance."  598 U.S. at 489.  That background principle only reinforces Congress's choice to leave omission cases out of the JASTA exception.

### III.    The District Court Acted Within Its Discretion in Denying Jurisdictional Discovery

Under *Butler v. Sukhoi Co.*, 579 F.3d 1307 (11th Cir. 2009), jurisdictional

discovery is unavailable to plaintiffs who fail "to establish a *prima facie* case" that

fits within one of the FSIA's statutory exceptions. *Id.* at 1314 (reversing district

court's grant of jurisdictional discovery as an abuse of discretion where the

plaintiff had not made out a *prima facie* case); *accord Arch Trading Corp. v.*

*Republic of Ecuador*, 839 F.3d 193, 206-07 (2d Cir. 2016) (similar requirement

for a "'reasonable basis' for the court first to assume jurisdiction"); *Arriba Ltd. v.*

*Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992) (reversing a district court

that had been "enticed into [a] discovery order prematurely" by a complaint that

failed "to plead how [the defendant] achieved the jurisdictional nexus necessary to

support subject matter jurisdiction in this country"). For the reasons given in Parts

I and II, Appellants fail to plead a *prima facie* case under either of the "two FSIA

exceptions" they invoke on appeal: the non-commercial-tort exception and

JASTA's terrorist-act exception. That alone is enough for this Court to affirm

the district court's denial of jurisdictional discovery.

Even where a plaintiff pleads a *prima facie* case, jurisdictional discovery

should be "circumspect[ ]" and used "only to verify allegations of specific facts

crucial to an immunity determination." *Butler*, 579 F.3d at 1314; *see also Sequeira*

*v. Republic of Nicaragua*, 815 F. App'x 345, 351-52 (11th Cir. 2020) (per curiam)

(concluding that a district court did not abuse its discretion by denying a jurisdictional discovery request based on its "breadth and lack of detail"); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000) (cautioning that jurisdictional discovery "is *not* permitted as a matter of course").  Here, Appellants presented the magistrate judge with "eight 'buckets' of discovery" that were "extremely broad."  App. 246a-247a; *see supra* pp. 7-8.[20]  He did not abuse his discretion in rejecting that list of buckets, and the district court properly rejected their objections to his ruling.

Appellants' challenges to that exercise of discretion lack merit.  *First*, they belatedly attempt (at 59-61) to reduce their list of eight buckets to three topics.  Whether the district court abused its discretion should be decided on the record before that court, which contained the eight-item list that Appellants now do not defend.  *Cf. Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1258 (11th Cir. 2015) (explaining, in the context of a new-trial motion, that the "'necessary implication'" of the abuse-of-discretion standard "'is that there can be no appellate review if the trial court was not given an opportunity to exercise its discretion'") (quoting *Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524, 1530 (11th Cir. 1988)).

---

[20] At oral argument, the magistrate judge even invited Appellants to present him with "specific areas" for "circumscribed, narrow jurisdictional discovery."  App. 702a (60:22-25).  Their counsel declined to do so, arguing that "we have multiple fronts in which we may need to do discovery."  App. 703a (61:11-12); *see also* App. 707a-708a (additional counsel for Appellants adding more discovery requests).

*Second*, the three topics are not attempts "to verify allegations of specific facts." *Butler*, 579 F.3d at 1314. The first topic (at 60) includes everything Saudi Arabia "knew about Al-Shamrani, the CLO, and the other trainees at NAS Pensacola" during the entire time from their "recruit[ment]" – years before they came to the United States – to Al Shamrani's attack. The second topic includes all "information" that Saudi Arabia "provided to the FBI and the Navy as part of their investigations into the attack." The third topic includes the "nature" of Saudi Arabia's "contractual relationship with the United States" – "including," but not limited to, "the contract itself." Appellants then argue that such discovery would shed light on "where particular actions were taken," about "whether [Saudi Arabia's] officers and agents had . . . discretion," or about Saudi Arabia's alleged "knowledge . . . of Al-Shamrani's radicalization." Appellants' Br. 60 (boldface omitted). Those are not specific facts – they are mere restatements of the FSIA's jurisdictional elements. The magistrate judge's determination that Appellants "impermissibl[y]" seek "broad discovery in the apparent hopes of finding information that may help establish an exception to the FSIA," App. 248a, thus applies no less to their three topics on appeal than to their eight buckets in the district court.

*Third*, Appellants contend that jurisdictional discovery is not "necessary for any of their claims besides Count Nineteen (breach of contract)" but "would go a

long way toward providing accurate answers to the questions the district court should have asked."  Appellants' Br. 62 (boldface omitted).  But jurisdictional discovery under the FSIA "'should be limited to the essentials necessary to determining the preliminary question of jurisdiction.'"  *Butler*, 579 F.3d at 1314 (quoting *Federal Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1284 n.11 (3d Cir. 1993)).  Appellants as much as concede they cannot meet that standard.

*Fourth*, Appellants fail to show that jurisdictional discovery is warranted even as to the breach-of-contract claim for which they say it is necessary.  They assert jurisdiction (at 21) over that claim only under the FSIA's waiver exception.  The magistrate judge properly analyzed Appellants' arguments under the waiver exception and concluded that they failed to allege any waiver of immunity, whether explicit or implied.  App. 240a-243a.  Appellants did not before the district court, and do not now, challenge the magistrate judge's reasoning that their allegations of waiver were insufficient.[21]  To the contrary, they concede that "[i]t is certainly 'speculative' whether the terms of the contract include an express waiver of the Kingdom's sovereign immunity," but argue that "the contract is relevant to

---

[21] Appellants misstate the record in asserting (at 58) that the district court did not address their contract claim.  The court considered and rejected Appellants' arguments that their "third-party breach of contract (Count 19)" claim satisfies the commercial-activity exception, App. 285a (discussing 28 U.S.C. § 1605(a)(2)), and also rejected their argument that they were entitled to discovery "to obtain the actual contract" between the United States "to see whether there are any terms of waiver," App. 288a-291a.

[their] claims more generally." Appellants' Br. 61 (boldface omitted). That concession is fatal. Jurisdictional discovery under the FSIA requires a "non-speculative basis for believing that th[e] details [sought] would establish jurisdiction." *Arch Trading*, 839 F.3d at 207. Jurisdictional discovery is not appropriate for merely relevant documents in the absence of a *prima facie* case for jurisdiction and in the absence of any tie to the verification of specific facts.[22]

*Fifth*, there is no reason to think that the district court's denial of jurisdictional discovery worked any substantive injustice. Well before Appellants filed this action, both the Navy and the FBI had investigated Al Shamrani's attack. The FBI's investigation involved "hundreds of special agents from the FBI, intelligence analysts, and professional experts," interviews of "more than 500 people, with witnesses, base personnel, and the shooter's friends, classmates, and associates," "dozens of surveillance teams," and "numerous search warrants, subpoenas, court orders, and emergency disclosure requests."[23] The Attorney

---

[22] Appellants' arguments to the magistrate judge made it even clearer that they were seeking discovery based on speculation about what agreements between Saudi Arabia and the United States might say, rather than to confirm specific allegations about what the contracts did say. *See* App. 704a (conceding that Appellants "don't know what the contracts say," "don't know what the terms are," and "don't know what the agreements were").

[23] Attorney General Barr and FBI Deputy Director Bowdich Hold Press Conference at 10:20-11:25 (Jan. 13, 2020), https://www.youtube.com/watch?v=sXI5qUsPjEY.

General credited Saudi Arabia with "complete and total support for our counter-terrorism investigation" and found "no evidence of assistance or pre-knowledge of the attack by other members of the Saudi military (or any other foreign nationals) who are training in the United States."  App. 678a.  Appellants have no basis beyond conjecture to contend that any amount of discovery would show otherwise.

## CONCLUSION

This Court should affirm the district court's dismissal of this suit for lack of jurisdiction and its denial of jurisdictional discovery.

Respectfully submitted,

/s/ *Michael K. Kellogg*
Michael K. Kellogg
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com
*Counsel for Appellee*
*Kingdom of Saudi Arabia*

September 25, 2024

## CERTIFICATE OF COMPLIANCE

1.    The foregoing Brief for Appellee complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), because this Brief contains 12,633 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    The foregoing Brief for Appellee complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this Brief has been prepared in proportionally spaced typeface using Microsoft Office Word 365 in 14 point Times New Roman.


Dated:  September 25, 2024          By:    /s/ *Michael K. Kellogg*
                                                        Michael K. Kellogg

## CERTIFICATE OF SERVICE

I hereby certify that, on September 25, 2024, I electronically filed the foregoing Brief for Appellee with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Michael K. Kellogg*
Michael K. Kellogg